[No. 29626. Department One. July 23, 1945.]

THE STATE OF WASHINGTON, *on the Relation of Judd Paul Smith, Plaintiff*, v. THE SUPERIOR COURT FOR KING COUNTY, *Chester A. Batchelor, Judge, et al., Respondents.*[1]

[1] Reported in 161 P. (2d) 188.

*Rummens & Griffin,* for relator.

*Catlett, Hartman, Jarvis & Williams,* for respondent.

MILLARD, J.—The present proceeding was commenced in this court by the putative father of two minor children to review, by writ of certiorari, an order wherein the superior court for King county, exercising its jurisdiction in juvenile cases, found the minors (aged three and five years) to be dependent children within the meaning of the juvenile court statute (Laws of 1913, chapter 160, p. 520, § 1), made the minors wards of the court, and placed them in the custody of Leona Marie Sparks, their maternal aunt.

The matter originated in the superior court on petition of Leona Marie Sparks, who alleged that she was the maternal aunt of the two minor children, Elizabeth Ann Waldroff and Patricia Jane Waldroff (known as Elizabeth Ann Smith and Patricia Jane Smith), who were born December 8, 1938, and August 21, 1940, respectively, in La Grande, Oregon, and that they are dependent children

and in need of guardianship by the court in that the mother of the said children, Agnes Helen Waldroff, was not married; that the said mother, Agnes Helen Waldroff, died in La Grande, Oregon, September 8, 1944, and that the alleged natural father, Judd Paul Smith, resides in La Grande, Oregon.

Petitioner Sparks further alleged that the said children reside with her and her husband, Wm. E. Sparks, in Seattle, Washington, and that it is their desire to adopt the two children. Petitioner prays the court to inquire into the condition of the said children and to enter such an order in the premises as should be for their welfare.

In his return to the order to show cause directed against him, relator Smith denied that the children were dependent, denied that the mother of the children was unmarried, and alleged that he and the mother of the children were married and that the said children were the issue of that marriage.

Trial of the cause on the merits to the court resulted in finding that the two minors involved herein are dependent children within the meaning of the juvenile court statute; that these children should remain and will be wards of the court; that relator Smith is not a fit and proper person to be awarded the custody, care, and control of the children; and that it is in the interests of the two minor children that they be placed in the custody of their maternal aunt. Consistent with the foregoing, the court entered an order (which is before us on petition of relator Smith for review and reversal thereof) placing the two minor children in the care, custody, and control of their maternal aunt and her husband, subject to further order of the court, with permission to relator Smith to visit the children at reasonable times; and, in the event any proceeding is instituted for adoption of the two minors, a notice of pendency of such proceeding shall be served on relator Smith and the juvenile department of the superior court for King county.

Counsel for relator contend that (1) the two minor children in this action are not dependent children within the

meaning of the juvenile court statute (Laws of 1913, chapter 160, § 1; Rem. Rev. Stat., § 1987-1 [P.P.C. § 359-1]); that (2) as the deathbed statement of the mother of the two minor children in question was self-serving and hearsay, it was not admissible in evidence; that (3) the trial court erred in adjudging that relator and the mother of the two minors involved herein were not legally married; and (4) that the trial court erred in adjudging relator was not a fit person to have care, custody, and control of the two children.

The ages of the two children in the case at bar are three and five years. The juvenile court statute (Laws of 1913, chapter 160) applies to all minor children under the age of eighteen years who are "delinquent" or "dependent." A "dependent" child is one under the age of eighteen years, ". . . (5) who has no parent or guardian; or who has no parent or guardian willing to exercise, or capable of exercising, proper parental control; or (6) who is destitute; or (7) whose home by reason of neglect, cruelty or depravity of its parents or either of them, or on the part of its guardian, or on the part of the person in whose custody or care it may be, or for any other reason, is an unfit place for such child; . . ."

The petition alleging "dependency" shall be verified and shall contain a statement of facts constituting such dependency as is defined in section 1 of the statute.

We have consistently given a liberal construction of the juvenile court statute and have habitually made the welfare of the minor children the primary consideration. The petition was sufficient to bring before the court the two minor children, alleged to be "dependent," for the purpose of determining the question of their dependency under the juvenile court statute. See *In re Day*, 189 Wash. 368, 65 P. (2d) 1049.

If, under the evidence, it is established that the putative father is not a fit and proper person to be awarded the care, custody and control of the two minor girls and it is in the interest and welfare of those two minors that they be

placed in the care and custody of their maternal aunt, the order of the trial court to that effect should be affirmed.

It is insisted, on behalf of relator, that, if the deathbed statement of the mother of the two minors be excluded, there is no evidence to sustain the findings and order of the trial court. Relator, who was not compelled to testify, argues that, by reason of the consideration in evidence of the deathbed statement, he deemed it advisable to become a witness and testify fully as to the relationship existing between him and the deceased mother of the two minors, whose custody their maternal aunt seeks.

It fairly appears from the record before us—excluding the deathbed statement and considering only the other evidence, which includes the testimony of relator Smith—that, in the fall of the year 1937, relator Smith and Agnes Helen Waldroff started out from La Grande, Oregon, for California. On arrival in San Francisco they lived together as man and wife. They returned to Oregon and resided in the house of relator at Maypark near La Grande.

The deceased represented to her family she had been married to relator Smith in Crescent City, California. Her first daughter, Elizabeth Ann (registered as Elizabeth Ann Smith), was born in La Grande, Oregon, December 8, 1938. A second child (registered as Patricia Jane Smith) was born to these parties August 21, 1940.

Agnes Helen Waldroff died September 8, 1944, as the result of injuries sustained in an automobile accident August 6, 1944. While in the hospital she dictated to her sister a statement which she subsequently read and signed, which statement was witnessed by Chas. H. Reynolds, Mrs. Gordon D. Wilson, and William C. Waldroff. In that statement, which relator contends was not admissible in evidence, is a recital of reason given by Agnes Helen Waldroff for accompanying relator Smith to California, returning with him to Oregon and remaining with him, and representing to the world that she was his wife although all of that period of time the parties were not married to each other.

Prior to the death of the mother of the two children, the two sisters of the deceased went to the children's home; gathered together their clothes and toys, and with relator's approval and consent took the children to Portland and later to Seattle, where all of the time thereafter they have been in the care of their maternal aunt, Leona Marie Sparks. In the spring of 1945, Smith came to Seattle and stated to Mrs. Sparks that he intended to remove the children from her home and take them back with him to Oregon. Mrs. Sparks, who believed this was contrary to the promises to the mother of the two children and convinced that he was not a fit and proper person to care for the two children, signed a petition upon which the order was issued declaring the children to be dependent children within the meaning of the juvenile court statute.

Smith and Agnes Helen Waldroff lived and cohabited together as husband and wife and lived at his farm two and one-half miles from La Grande, Oregon, for a period of time commencing about one year prior to the birth of the elder child until the time of the death of Miss Waldroff, a period of more than six years.

Relator Smith testified: He and deceased commenced cohabiting together early in 1938. He was then divorced, but Agnes Helen Waldroff was unmarried. Later, it became evident that she was pregnant. He had lived in La Grande all of his life, and everyone there was acquainted with him. He owns and operates a fruit farm and for many years owned and operated a beer tavern as a side line. Agnes Helen Waldroff had lived in La Grande for some time and had an extensive acquaintance. They were generally known as husband and wife. Not even members of his or her families had the slightest suspicion that they were not married. If they were married in Oregon, such fact would be made public and their former illicit cohabitation would be disclosed, which publicity he and Miss Waldroff wanted to avoid.

He further testified that they both knew that a common-law marriage contracted by them in the state of Idaho would be valid, and that marriage could there be entered

into without publicity as to the time and place the marriage occurred. With the intention of intermarrying, in June, 1938, they drove in his automobile from their home in La Grande, through Pendleton, Oregon, Walla Walla, Washington, and eastward into Lewiston, Idaho, where they met Howard Wilson, a resident of La Grande with whom they had been acquainted for several years. Relator Smith introduced Miss Waldroff as his wife, and the three of them visited in a beer parlor for about half an hour. Later, he and Miss Waldroff drove to New Meadows, Idaho, where they registered at an auto camp as Judd Smith and wife, and on each of the two succeeding nights they registered as husband and wife. From that day until the time of her death, they lived and cohabited together as husband and wife. Their purpose in making the trip to Idaho was in the nature of a pleasure trip. The method employed and their purpose in employing it was to avoid publicity.

Howard Wilson testified he met Judd Smith and Miss Waldroff at the time in question, and that Smith introduced Miss Waldroff as his wife; that he had known both parties a number of years and had visited at their home.

The testimony on behalf of Smith is merely that he and Miss Waldroff lived in illicit cohabitation in Oregon until June, 1938, when they entered into a marital relationship in Idaho by stating to Wilson they were husband and wife, sojourning in Idaho for four days and three nights as husband and wife, and later returning to Oregon, where they held themselves out to the world until her death as husband and wife.

It is not necessary to discuss the question as to admissibility in evidence of the deathbed statement of Miss Waldroff. No good purpose may be served by burdening this opinion with a review of the authorities on the question of the admissibility of the declaration of a deceased parent as to legitimacy of that parent's children. That relator Smith was not legally married to Agnes Helen Waldroff, is clearly established by the testimony of relator and other

evidence which does not include the deathbed statement of Miss Waldroff.

The trial court did not believe, nor do we, the story of Smith that, after having lived illicitly with Miss Waldroff for the period that he did, he ever intended to contract a common-law marriage in the state of Idaho or that he ever intended to give the woman with whom he had lived more than six years, or the children she bore for him, his name. The conclusion is irresistible that he desired to remain free.

Other than the testimony of relator Smith, there is no evidence that Smith ever intended to go to Idaho and there contract a common-law marriage with the deceased. Mrs. Sparks testified that in March, 1944, which was prior to the time that her sister sustained the injury which resulted in death and which, of course, was prior to the commencement of this action, her sister (the deceased) telephoned from her home in Oregon to Mrs. Sparks in Seattle and informed the latter that Smith had struck her and had said that he was not the father of the two children. This evidence was not considered by the trial court, which informed counsel that what deceased told third parties was inadmissible. Mrs. Sparks was permitted, however, to testify that relator Smith came to the telephone and told Mrs. Sparks and Mr. Sparks that he had made the remark that he was not the father of the two children. Mrs. Sparks further testified that Smith stated he had struck the deceased but that he had done it only in self defense.

Deceased had suffered from infantile paralysis since she was a young girl. She was so crippled that she was unable to run; in fact, she walked with difficulty. Mrs. Sparks also testified that Smith said, "He supposed he should have married the girl." Never during the lifetime of Miss Waldroff did Smith make any statement to Miss Waldroff's relatives that there had been a marriage in the state of Idaho.

We understand it to be the position of relator Smith that all that is necessary under the laws of state of Idaho to establish a common-law marriage is proof that a man and woman while in Idaho hold themselves out to be husband and wife, and that the relationship of husband and wife of

such parties will be recognized in sister states. Relator invokes the Idaho statute, 2 Idaho Code Annotated 1932 (Official ed.) 568, §§ 31-201, 31-203, 31-209, reading as follows:

"Marriage is a personal relation arising out of a civil contract, to which the consent of parties capable of making it is necessary. Consent alone will not constitute marriage; it must be followed by a solemnization, or by a mutual assumption of marital rights, duties or obligations.

"Consent to and subsequent consummation of marriage may be manifested in any form, and may be proved under the same general rules of evidence as facts in other cases.

"All marriages contracted without this state, which would be valid by the laws of the country in which the same were contracted, are valid in this state."

Under the quoted statute, the personal relationship of marriage arises out of a civil contract to which the consent of the parties making it is prerequisite. Consent alone will not constitute marriage. There is the additional condition that there must be either a solemnization, or a mutual assumption of marital rights, duties and obligations. Such marriage is frequently designated a common-law marriage, inasmuch as the common law requires an *actual* agreement of the parties to become husband and wife.

■■ We find no credible evidence that Smith and the deceased ever mutually promised in Idaho to become husband and wife, and there is not a syllable of testimony even from Smith himself that any promises were exchanged by him and deceased in Idaho.

True, as respondents' counsel concede, there may be an inference of such an agreement in the absence of other evidence from conduct, and the holding out of each other as husband and wife is such conduct; however, where the parties—as in the case at bar—have been living together for a long period of time in another state as man and wife, which relationship was admittedly illicit, then the inference for which relator contends cannot be drawn from a mere continuance of the illicit relationship.

Where, as in the case at bar, the cohabitation was admittedly illicit in its inception, the burden is upon the parties so contending to show subsequently that there was some

change which made the relationship legal. See *Stans v. Baitey,* 9 Wash. 115, 37 Pac. 316.

"A union once originating between man and woman, purely illicit in its character, and voluntarily so, there must appear some formal and explicit agreement between the parties thereto, or a marriage ceremony, or some open and visible change in their habits and relations, pointing to honest intentions, before their alliance can be regarded as converted into either a formal or an informal marriage, as although the relations between them were illicit in the beginning still a common-law marriage may later occur between them." 2 Schouler, Marriage, Divorce, Separation (6th ed.) 1438, § 1181.

See, also, *Blodgett v. Blodgett,* 109 Wash. 597, 187 Pac. 340.

We concur in the view of the trial court that where parties cohabit illicitly in the state of their residence and who happen to temporarily sojourn—only a few days in the case at bar—in a state where common-law marriage is recognized, even if during those few days they hold themselves out as man and wife those parties cannot by that conduct alone become legally man and wife.

Parties who live for years in illicit relationship in a state in which they were domiciled will not find themselves married to each other if they happen to sojourn for a short time and hold themselves out as man and wife in a state where common-law marriage is recognized.

In an action for divorce in Massachusetts, it was held, in *Norcross v. Norcross,* 155 Mass. 425, 427, 29 N. E. 506, that evidence that a man and woman cohabited in Massachusetts under an unsolemnized marriage contract, lived together in the same relationship at one time for three days and another for one week in New York, is insufficient to show a marriage, though the marriage contract made between the parties in the latter state followed by cohabitation constitutes a marriage. In the case cited, the court said:

"If the acts which took place in New Hampshire had taken place in New York, they probably would have been held to constitute a marriage there. . . . But there was no evidence that the parties while in New York entered into any contract of marriage between themselves. The substance

of what was proved is, that the parties, without being married, were living together as husband and wife in Massachusetts, and while doing so they twice went to New York together and continued in the same apparent relation, at one time for three days, and at another for one week. We have not been referred to any decision in New York which holds that these facts would either constitute marriage there, or afford a conclusive presumption of it; and we are slow to believe that acts which in Massachusetts were illicit will be deemed matrimonial merely by being continued without any new sanction by residents of Massachusetts while transiently across the State line."

■ The cruelty and depravity of Smith are established by the evidence recited above. The home of the putative father is an unfit place for the two minor children, and Smith is not a fit person to have the care, custody, and control of the minor children.

We agree with counsel for relator that courts have no right to deprive a parent of the custody of his children unless such parent shows unfitness to have such custody. We reiterate that relator Smith's story of his relationship with the deceased and the other unquestionably competent evidence in this case conclusively establish relator's unfitness to have the care, custody, and control of the two minor children whom he selfishly and inexcusably refused to legitimize.

■ The welfare of the children is of paramount importance in determining who is entitled to their custody, and that rule, which is applicable to illegitimate as well as legitimate children, was observed by the trial court.

*Williams v. North Carolina*, 317 U. S. 287, 87 L. Ed. 279, 63 S. Ct. 207, in which North Carolina did not challenge the finding of the Nevada court that petitioners had acquired domiciles in Nevada, was cited in a subsequent case (325 U. S. 226, 65 S. Ct. 1092) between the same parties. The first case was reversed by the United States supreme court. In the opinion of the United States supreme court, which affirmed the supreme court of North Carolina in the second case, it is stated that the North Carolina court gave appropriate weight to the finding of domicile in the Nevada de-

crees, which finding was permitted to be overturned by relevant standards of proof. The foregoing does not sustain the position of relator respecting faith and credit to be given in this state to his claimed common-law marriage to the deceased in Idaho.

The order of the trial court is affirmed.

BEALS, C. J., STEINERT, JEFFERS, and GRADY, JJ., concur.

[1]Reported in 161 P. (2d) 145.