Bonnie Black WALKER and Janet Elaine WALKER *v.*
Betty Walker YARBROUGH, Administratrix of the
Estate of A. C. (Jack) Walker, Deceased

74-141                                            516 S.W. 2d 390

Opinion delivered December 2, 1974

*Dan McCraw, Ike Allen Laws Jr.,* P.A. and *W. H. Schulze,*
for appellants.

*Williams & Gardner,* for appellee.

J. Fred Jones, Justice. A. C. (Jack) Walker died on
November 12, 1969, and Betty Walker Yarbrough was ap-
pointed administratrix of his estate in compliance with her
petition alleging that she was the only daughter and sole sur-
viving heir of Mr. Walker. The appellant, as Bonnie Black
Walker, filed a petition in the probate court alleging that she
was the widow of Mr. Walker and that her minor child, Janet
Elaine, was a daughter and heir of Mr. Walker and as such
was entitled to a one-half interest in his estate after the ex-
penses of administration, and her own dower interest were set
aside. The appellant prayed that her dower interest in the

property of Mr. Walker be set aside and awarded to her and that their daughter, Janet Elaine, be awarded her one-half interest in the remainder of Mr. Walker's estate. Bonnie's petition was based on an alleged common-law marriage. The probate judge found that Bonnie failed to establish a valid common-law marriage with Mr Walker. He dismissed her petition and decreed that Betty Walker Yarbrough was the sole surviving heir of Mr. Walker and was entitled to his estate.

On appeal to this court Bonnie and Janet Elaine rely on two points for reversal: First, they contend that the chancellor erred in finding that A. C. (Jack) Walker and Bonnie Black Walker were not common-law husband and wife and, second, they contend that there was substantial evidence Janet Elaine was the daughter of A. C. (Jack) Walker and that he recognized her as such. We do not reach appellants' second point because we are of the opinion the chancellor was correct in finding that A. C. (Jack) Walker and Bonnie Black Walker were not common-law husband and wife.

Bonnie's petition, insofar as the child is concerned, is based on Ark. Stat. Ann. § 61-141 (b) (Repl. 1971) which reads as follows:

"If a man have a child or children by a woman, and afterward shall intermarry with her, and shall recognize such child or children to be his, such child or children shall be deemed and considered as legitimate."

It is conceded by all parties concerned that Mr. Walker and Bonnie were never married in a civil or religious ceremonial marriage and apparently the parties recognize that before Bonnie or her child, Janet Elaine, would be entitled to share in Mr. Walker's estate, it would be necessary to prove that Mr. Walker had intermarried with Bonnie.

The evidence is to the effect that Mr. Walker was approximately 65 and Bonnie was approximately 34 years of age when they met in Hot Springs in 1958 or 1959. Mr.

Walker owned farmland with a house thereon near Russellville and also maintained a house trailer at different locations in Hot Springs. Bonnie owned her home in Hot Springs and she and Mr. Walker entered into an illicit relationship and periodic illegal cohabitation in Hot Springs and on his farm near Russellville, and the relationship continued intermittently until about 1967.

The child Janet Elaine was born to Bonnie on August 28, 1963. There is considerable conflicting evidence directed to the question of whether Mr. Walker was the father of the child and to his acknowledgment that he was the father of the child as well as to his acts and intentions concerning her welfare. We find it unnecessary to discuss this evidence because this case turns on the question of whether Mr. Walker and Bonnie ever married. Common-law marriages, of course, are not permitted in Arkansas and the question narrows down to whether or not a marriage was contracted between the parties outside the state of Arkansas which would be recognized in this state under Ark. Stat. Ann. § 55-110 (Repl. 1971) which reads as follows:

"All marriages contracted without this State, which would be valid by the laws of the State or country in which the same were consummated, and the parties then actually resided, shall be valid in all the courts in this State."

The evidence on this point is to the effect that in 1966 Mr. Walker took Bonnie and her daughter on a trip to California where they spent four or five days with relatives in that state and returned to Arkansas through the state of Colorado where they also spent five or six days visiting with Bonnie's relatives in that state. The evidence is also to the effect that Mr. Bob Chandler had lived with Mr. Walker in his home near Russellville and they had become quite good friends. In 1966 Mr. Chandler was in the automobile business at De Queen, Arkansas, and Mr. Walker visited with him on different occasions. Chandler testified that Mr. Walker brought Bonnie and the child to De Queen in 1966. He said he knew that Bonnie and Walker were not married

and he mentioned that fact to Mr. Walker. He said Mr. Walker first told him that he and Bonnie had married in Old Mexico, but that he then inquired about the marriage laws in Oklahoma as well as other states and he directed Mr. Walker to consult an attorney in De Queen.

The evidence is to the effect that prior to making the trip to California, Mr. Walker and Bonnie Mae Hawthorn[1] made application in Sevier County for a marriage license and license was issued on May 9, 1966. Bonnie said Mr. Walker carried the marriage license with them on their trip to California and surrendered the license unused upon their return to Arkansas.

The appellant argues that she and Mr. Walker succeeded in contracting a common-law marriage, primarily in the state of Colorado which recognizes common-law marriages, and that the marriage so contracted should be recognized in Arkansas. We are of the opinion that the evidence falls far short of proving the consummation of a marriage contract entered into in the state of Colorado or any other state.

The evidence in this case is as consistent with concerted effort and intention to avoid a marriage contract as it is in ent ring into and consummating one. According to Bonnie Mae's own testimony, she and Mr. Walker simply entered into an illicit relationship at Hot Springs, Arkansas, in about 1959 and continued that relationship at intervals for about ten years. She said that in 1967 she refused to go to Russellville with Walker and excerpts from her testimony are as follows:

"Q. At that time you refused to come to Russellville with him did you not?

A. I had been working on my house at Alpine. Yes, sir, I did. I told him he could just take me back to Alpine and he could go his way which was up at Russellville to

---

[1]Bonnie's maiden name was "Black," she had married a Mr. Hawthorn and upon divorce from him she reassumed her maiden name.

Betty or to Mrs. Edna Walker and Myra. And then in uh - September of '67 I went to work. I went to work at the Ouachita Hospital which that means I was not staying up at Russellville. I was staying then in Hot Springs but Jack was still in and out with me at my house on Alpine, 116½.

\* \* \*

Maybe a week or two weeks he'd be gone. And then he would be back. But as far as living with him, I considered myself living with him even if he was in and out because that was his way of doing things."

Bonnie said she and the child went on a trip to California and back through Colorado with Mr. Walker. She said she had been with him to El Paso, Texas, and Old Mexico. She said they first visited Walker's niece, Imajean Carney, in California. She said they occupied the same room and bed in a guesthouse at Mrs. Carney's home and told Mrs. Carney they were married. On this point Bonnie testified as follows:

"Q. Now did you represent — did you tell Mr. and Mrs. Carney that you were married?

A. Yes, sir.

Q. How were you introduced when you were in California?

A. Well, I don't really remember how Jack put it, but he was always saying I was his nurse, and his wife, and just everything. And I was. Even a painter, a plumber, I don't know what else. I've even helped him mow the grass.

Q. Did Mrs. Carney introduce you and Mr. Walker to any of her friends out there?

A. Her friends?

Q. Yes.

A. Oh, she had a neighbor, but I couldn't remember the neighbor's name that came over that lived close to her. She did but I couldn't.

Q. Do you know how she introduced you?

A. I don't remember her words, no, sir."

Bonnie also said they spent one night in a motel in California and also visited a nudist colony.

"Q. Will you tell us, please, what was said at the nudist colony concerning your marriage?

A. Well, Jack — he asked Jack if that was his wife and he said yes. And Jack had to sign the register. He signed it Bonnie Black, Janet and Jack Walker. Maybe he said A. C. Walker. I don't know. We got the little card, Bonnie and Jack Walker, I believe. Three day visit or something like that."

Bonnie said they also visited with Russell Cannon in California. She said they occupied the same bedroom in the Cannon home and told Cannon they were married.

"Q. Did you all stay in the same room at Russell Cannon's house?

A. Right.

Q. Did you all represent to Russell Cannon that you were married?

A. Yes.

Q. Did Russell Cannon introduce you as man and wife?

A. I can't recall. We were at his shop almost every day but I don't know if anybody come in.

Q. And you all had Janet with you at the time?

A. Janet was with me.

Q. Then after you left Russell Cannon's house where did you go?

A. Oh, we went to uh — my aunt's, Cheyenne Wells. We stopped somewhere overnight. I don't just remember, in Arizona I believe. But I don't know where it was, but we did stop, make one stop between California and my aunt's. And my aunt was in the hospital and we went to my cousin's in Arapaho, Colorado, and she lives sort of out in the country, and she had a place in town which town is a little wide spot in the road. And Jack and I and Janet stayed at her house in town. And they were out on the farm.

Q. This is Mrs. Irwin, is that correct?

A. Right, Mary Francis.

Q. Did you and Jack tell Mr. and Mrs. Irwin that you were married?

A. Yes, sir.

Q. Did you all live together at her house in town?

A. Yes, sir.

Q. With Janet?

A. With Janet.

Q. And you stayed there I believe almost a week, is that right?

A. Well could be. I don't remember just how many days.

Q. Did your cousin introduce you as husband and wife to her friends there in Arapaho?

A. Yes, sir.

Q. And Mrs. Walker, you and Jack Walker actually never went through a marriage ceremony, did you?

A. We never said I do in front of Justice of the Peace or minister but other than that we went through blood test and all of that. Got the license and everything.

Q. All right, now I believe that one time you all went to Mexico *for the purpose of getting married,* is that correct?

A. Right.

Q. Would you tell us what happened on that time?

A. Oh, we went to Mrs. Douglas's in El Paso and she went with us over into Mexico with the —

Q. Did you do anything toward completing the marriage?

A. Well we had our blood tested again in El Paso, Texas and I was with Jack except I wasn't with him. Mrs. Douglas — I went over with him but I never did — Jack never did want me around him when he was talking about business with anyone and he went in several places, and what they talked about, I just couldn't say. I presume I know what they went in there for to talk about but I wasn't with him.

Q. In any event you went across the river into Mexico but you did not complete the marriage there as far as the legal formalities?

A. No, sir." (Emphasis added).

On cross-examination Bonnie testified in part as follows:

"Q. When do you say you and Jack entered into a common-law marriage?

A. Well I would say when we first started living together and having sexual intercourse.

Q. In Arkansas, Hot Springs and Russellville?

A. Right.

Q. All right, and that's when you are telling the court it occurred?

A. Well if I understand your question right."

On cross-examination Bonnie testified that the trip to El Paso, when they visited Mrs. Douglas, was in December, 1966, *after their trip to California.*

Mr. Russell Cannon testified in part as follows:

"Q. You've heard Mrs. Black's testimony that she and Jack and Janet visited in your home in California?

A. Yes, sir.

Q. Sometime in the summer of 1966?

A. Yes, sir.

Q. Do you recall that visit?

A. Yes, sir.

Q. Mr. Cannon, do you recall anyone introducing Jack and Bonnie as husband and wife?

A. No, sir.

Q. Do you remember him referring to her as his wife?

A. No, sir.

Q. Do you remember anyone saying anything about her being his wife in his presence?

A. No, sir.

Q. Did you introduce them to any of your friends?

A. Did I introduce them to any of my friends?

Q. Yes.

A. No, sir, I don't think so.

Q. Do you remember how long they were there?

A. Probably four or five days, six days.

Q. What were the sleeping arrangements while they were there?

A. Well Bonnie and this baby slept in my wife's bedroom, and I slept with my uncle, and my wife slept in the daybed.

Q. You mean you slept with Jack Walker?

A. Yeah.

Q. He your uncle?

A. Yeah.

Q. This was the sleeping arrangements when you were in California?

A. Yes, sir.

Q. Was that the only time they were at your house?

A. Yes, sir.

* * *

Q. Did you ever talk with him about his relationship with Bonnie Black and Janet? Other than —

A. Other than just asking who she was and he said she was his nurse. He couldn't live alone. Had sugar diabetes and he'd pass out."

Mrs. Irwin testified on interrogatories that she and Bonnie are first cousins; that Bonnie and Walker spent three or four days in her home in Colorado in 1966. She said Bonnie told her they were married but that Mr. Walker did not. She said they occupied the same bedroom while there and that she introduced them to Guy Cuttler as husband and wife.

Several deeds and mortgages executed by Walker as well as Bonnie were introduced into evidence and they were separately signed by Walker as well as Bonnie as single and unmarried persons. Bonnie retained her name as "Black" on her Social Security identification. The child's birth certificate recited her name as "Black," and this was never changed.

The appellant cites *Darling v. Dent,* 82 Ark. 76, 100 S.W. 747, and *Stilley v. Stilley,* 219 Ark. 813, 244 S.W.2d 958, as precedent for recognizing out of state common-law marriages as legal marriages in Arkansas. These cases are readily distinguishable from the case at bar. In *Darling* there was uncontroverted testimony that Mr. Darling and Mrs. Williams went to Texas with the intent of obtaining a divorce for Mrs. Williams and getting married. Mr. Williams died and Mrs. Williams described an actual marriage ceremony in Texas followed by continuous cohabitation as husband and wife for about eight months in Texas, followed by about eleven years in Arkansas until Darling's death.

In *Stilley, supra,* the parties were ceremoniously married in Arkansas and went to Kansas where their five children were born. Mrs. Stilley obtained a divorce in Kansas and was awarded the custody of the children and child support. She returned to Arkansas and by amended complaint in chancery court alleged that she was under age at the time of the marriage and prayed that the marriage be canceled as absolutely void and of no effect. We held, in effect, that Mrs. Stilley had ratified the Arkansas marriage, even if it were void, by living with Mr. Stilley as husband and wife for nine years in Kansas (a common-law marriage state) and bearing

five children and obtaining a divorce in which the decree recited that they were married.

The appellant also relies on the Colorado case of *Taylor* v. *Taylor*, 10 Colo. App. 303, 50 P. 1049, as setting out the requirements for a valid common-law marriage in that state. The *Taylor* case was also relied on in the Nebraska case of *In Re Binger's Estate*, 63 N.W.2d 784. The pertinent facts as well as the statutory law in that case were almost on all fours with those in the case at bar. In *Binger's Estate* an invalid marriage was performed in Missouri and a Colorado common-law marriage was relied on and in issue. In that case the Nebraska Court said:

> "[P]laintiff argued that after her legal impediment had been removed, there was a common-law marriage which we should recognize by virtue of the law and decisions of Colorado, concededly a common-law state.
>
> That contention is predicated upon section 42-117, R.R.S.1943, which provides: 'All marriages contracted without this state, which would be valid by the laws of the country in which the same were contracted, shall be valid in all courts and places in this state.' The question is then whether or not under the circumstances of this case there was any valid common-law marriage in Colorado, which this state should recognize. We conclude that there was not.
>
> Plaintiff claims that there was a common-law marriage in Colorado because upon three pleasure trips respectively, one in October 1947, one in June 1950, and one in September 1951, she and decedent twice attended conventions and once visited relatives in Colorado for 3 or 4 days each trip. On such occasions they either registered at a named motel as husband and wife, or stayed with relatives, where they slept in the same bed, cohabited, and were introduced to or by friends and relatives as husband and wife, after which they returned to their home in Weeping Water. No claim is made that they ever actually resided or had a domicile in Colorado or in any other state except Nebraska. There is no evidence

that any of such trips to Colorado were made for the purpose of changing their domicile or residence to that jurisdiction or contracting a common-law marriage while they were in that state, or that while there any agreement was ever made by them to become husband and wife, or that they ever thought that such was necessary to give their marriage any validity."

In *Binger's Estate, supra,* the Nebraska Court cites and comments on several decisions from other states and in reference to the Colorado cases, said:

"Plaintiff relies upon the above cases, but they are all distinguishable. The parties therein all lived in and were bona fide residents of Colorado where as such they, in good faith, intending to be married, continuously cohabited, and held themselves out as husband and wife in that state for long periods of time. Here the parties, who were at all times bona fide residents of this state where common-law marriage is invalid, simply took short pleasure trips across the state line without ever intending to contract or contracting a common-law marriage in Colorado as required by its laws."

We approve the language and adopt the reasoning expressed by the Washington Supreme Court as quoted by the Nebraska Court in *Binger's Estate* as follows:

"In State ex rel. Smith v. Superior Court, 23 Wash.2d 357, 161 P.2d 188, 192, the court said: 'We concur in the view of the trial court that where parties cohabit illicitly in the state of their residence and who happen to temporarily sojourn — only a few days in the case at bar — in a state where common law marriage is recognized, even if during those few days they hold themselves out as man and wife, those parties cannot by that conduct alone become legally man and wife.

'Parties who live for years in illicit relationship in a state in which they were domiciled will not find themselves married to each other if they happen to sojourn for a short time and hold themselves out as man and wife in a

state where common law marriage is recognized.' "

There is no evidence in the record that Bonnie and Walker ever contracted a marriage without this state, within the meaning of Ark. Stat. Ann. § 55-110, *supra.*

The judgment is affirmed.

BYRD, J., concurs.