## DOROTHY M. GOLDIN v. MILTON GOLDIN

[No. 879, September Term, 1980.]

*Decided March 5, 1981.*

The cause was argued before GILBERT, C. J., and THOMPSON and WEANT, JJ.

*Bryan Renehan,* with whom were *Brodsky, Greenblatt & Renehan* on the brief, for appellant.

*William Bogen,* with whom were *Bogen, Yavener & Berman* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

"Marriages," John Lyly [1] penned, "are made in Heaven and consummated on earth." [2] No problem exists in the matter before us as to the consummation of the "marriage." What we are concerned with is whether Pennsylvania is part of Heaven.

The Circuit Court for Montgomery County (Shearin, J.) found that no marriage existed between Dorothy M. Goldin, appellant, and Milton Goldin, appellee. Accordingly, Judge Shearin dismissed Mrs. Goldin's bill of complaint for a divorce *a mensa et thoro.* Understandably perturbed by the ruling of the chancellor, Mrs. Goldin has carried her cause to this Court. Here, she asserts the circuit court erred in holding that she had "not proven a common-law marriage" to the appellee.

## — THE FACTS —

This domestic drama began in Buffalo, New York, in 1954 or 1955 when the parties met at "some of the bowling functions." Each of the two litigants was married at the time, but not to each other. They "entered into a relationship."

In 1956 Mrs. Goldin obtained an annulment of her marriage to Mr. Williams. Legally, she was free to remarry, but satisfying legal niceties did not solve the religious problems confronting her. Mr. Goldin obtained a divorce from his former spouse. At that time he had converted his faith from Judaism to Catholicism. He testified that inasmuch as he had entered into a marital status with his former wife prior to his conversion, the divorce from her left him "free to marry in the Catholic theology."

The Goldins moved to Falls Church, Virginia, in 1958. They were advised that Mrs. Goldin "was not free to be married" in the eyes of the Catholic Church. Mrs. Goldin told Judge Shearin that a priest "suggested that if we were going to live in the same house, we would have the choice of two options: [(1)] we could either enter [into] a civil marriage,

---

1. C 1554-1606.
2. *Mother Bombie* [1590] Act IV, sc. i.

leave the Catholic faith, and hope and pray that we could —
conditions would change and we could re-enter the faith or
[(2)] we could attempt to live as brother and sister, which
meant living in the same house avoiding the appearance of
scandal, which meant assuming the Mr. and Mrs. name, [3]
but having no intimate relationship."

The parties opted for the latter choice. Apparently, they
were unsuccessful in their attempt because two children
were born to them.

Mr. Goldin related that when their son was born, a dis-
cussion was had over "whether or not we should leave the
church, enter into a marriage condition, and at that time
Dorothy [Mrs. Goldin] was not willing to do that."

Mrs. Goldin testified that while she considered herself
"married" to Mr. Goldin, she did not enter into a civil mar-
riage ceremony with him because of her religious beliefs.
Moreover, whenever Mr. Goldin proposed marriage she
would respond that they "were married."

The parties lived together in Virginia [4] for seven years
and then moved to Maryland where they have resided for
approximately fifteen years. At all times Mrs. Goldin con-
tinued to use that name. The parties bought a house as
tenants by the entireties, [5] executed a mortgage, seemingly
as husband and wife, filed joint tax returns, both federal and
State, in the same capacity, maintained joint bank accounts,
and, inferentially, conducted themselves as husband and
wife.

---

**3.** *Morris Dictionary of Words and Phrase Origins,* p. 369, defines
"married name" as follows:

> "Most women take their husband's surnames at the time of mar-
> riage, although there have been exceptions. It all goes back to
> Roman times, when there were fewer names to go around and as
> a result, much confusion between the Octavias and Lauras. So
> when Octavia married Cicero, for example, she became Octavia
> Ciceronis (Octavia of Cicero). Before long the possessive case
> ending — *nis* dropped off, and she became simply Octavia Cicero
> — and that's the way it is today."

**4.** The Commonwealth of Virginia does not permit the contracting of
common-law marriages within its borders.

**5.** A method of titling of property that is reserved exclusively to husband
and wife.

During the period 1964 through 1969, the parties were "into skiing." They, accompanied by the two children, who were very young, journeyed "almost every weekend," and some holidays, to Seven Springs, Pennsylvania. They usually stayed at a motel where they registered as Mr. & Mrs. Goldin. All four slept in the same room. The exact sleeping arrangements were disputed. Whether Mr. & Mrs. Goldin shared the same bed is purely a matter for the fact-finder to resolve. Mrs. Goldin testified that she and Mr. Goldin engaged in sexual relations after the children had gone to sleep. Mr. Goldin flatly denies any sexual contact because the children were in the same room.

It is clear that Judge Shearin, while finding the testimony from both sides to be credible, manifestly attached more weight to that of Mr. Goldin. In any event the judge felt that Mrs. Goldin had not met the burden of proof.

## — THE LAW —

Maryland has continuously held that a common-law marriage, valid where contracted, is recognized in this State.[6] Absent a showing that the "marriage" was valid where performed, no amount of holding out as husband and wife, reputation as being husband and wife, number of children, or any other factor will transpose the living together of a man and woman into a legal marriage in this State. Marriage does not take place simply because a man and woman cohabit for a protracted period of time.[7] We do not recognize "marriage by estoppel."

Whenever a party asserts that he or she and another were united in marriage by common law in a jurisdiction that

---

**6.** Laccetti v. Laccetti, 245 Md. 97, 225 A.2d 266 (1967); Henderson v. Henderson, 199 Md. 449, 87 A.2d 403 (1952); Bannister v. Bannister, 181 Md. 177, 29 A.2d 287 (1942); Marshall v. Stefanides, 17 Md. App. 364, 302 A.2d 682 (1973).

**7.** See Justice Holmes, dissenting, Travers v. Reinhardt, 205 U.S. 423, 442, 27 S. Ct. 563, 51 L. Ed. 865 (1907).

158

sanctions such marriages, the burden of proof is upon the party asserting the common-law marriage.[8]

Marriages in Maryland are controlled and regulated by Md. Ann. Code art. 62. Prior to Laws 1963, ch. 406, no valid marriage could be performed in this State without some sort of religious ceremony. *Denison v. Denison,* 35 Md. 361 (1872). By the 1963 act, clerks or deputy clerks, designated by the resident circuit court judges were permitted to perform marriages.

Since neither Virginia nor Maryland allows the contracting of a common-law marriage within their respective geographical confines, the marriage between the parties, if there is one, must have occurred in Pennsylvania.

Pennsylvania authorizes the contracting of common-law marriages. *See, e.g., Sullivan v. American Bridge Co.,* 115 Pa. Super. 536, 176 A. 24 (1935); *Brown v. Nolen & Sons,* 298 Pa. 384, 148 A. 498 (1930); *Estate of Nelson Stine,* 98 Pa. Super. 7 (1930); *In re Ward's Estate,* 296 Pa. 20, 145 A. 676 (1929); *Richard v. Brehm,* 73 Pa. 140, 13 Am. Rep. 733 (1873); *Guardians of the Poor v. Nathans,* 2 Brewster (Pa.) 149 (1845).

What we need to decide is what are the necessary elements of such a marital undertaking. Does the fact that a man and woman, free to marry, register in a hotel, motel or other temporary shelter, *ipso facto* make them husband and wife under the law of Pennsylvania, or is something more required? Suppose, as in the case now before us, the couple spent a number of winter weekends in Pennsylvania where they registered as husband and wife, does that fact convert them into a married couple? Given the background of the instant case where the couple lived together for a prolonged time in States that do not permit the contracting of common-law marriages, and adding to those facts the weekends in Pennsylvania, is the relationship changed by judicial chemistry into a valid common-law marriage?

---

8. *See* J. W. Madden, *Handbook on the Law of Persons and Domestic Relations* (1931) ch. 1, p. 68 and cases therein cited.

All the above questions have the same answer, and this is, *maybe,* it all depends upon the facts of each particular case.

In *Sullivan v. American Bridge Co., supra,* a couple attempted to get married in New Jersey, but did not because they were unwilling to wait the necessary time between licensing and marriage. They traveled to Maryland in an effort to be married but were again frustrated because of a lack of a witness. Notwithstanding that, they exchanged vows without the benefit of clergy. Obviously, the exchange of promises in Maryland had no legal effect. *Denison v. Denison,* 35 Md. at 380. "To constitute lawful marriage here there must be superadded to the civil contract some religious ceremony." *Id.*

The parties then cohabited in New Jersey and Pennsylvania. The court apparently applied Pennsylvania law to effectuate the exchange of vows in Maryland, stating that the fact that a marriage cannot be contracted because of legal or religious impediments does not mean citizens shall not be married abroad. The court held that the exchange of vows in Maryland considered with the residency in New Jersey and Pennsylvania established the common-law marriage. *See also Travers v. Reinhardt, supra.*

A New York court, in *McCullon v. McCullon,* 96 Misc. 2d 962, 410 N.Y.S.2d 226 (1978), held that visitations to the Pennsylvania home of the alleged husband's parents for a two to four week period each year, together with the New York cohabitation and reputation, was sufficient to establish a common-law marriage under Pennsylvania law.

A number of other jurisdictions have arrived at a different conclusion. In *State ex rel. Smith v. Superior Court for King County,* 23 Wash. 2d 357, 161 P.2d 188 (1945), the facts were that a couple, in the fall of 1937, went to San Francisco where "they lived together as man and wife. They returned to Oregon and resided in . . . [a] house . . . near La Grande." The woman represented to her family that she and Judd Smith were married in Crescent City, California. Two children were born to the couple. In 1944 the woman died as a result of injuries sustained in an automobile accident. While

she was "in the hospital she dictated to her sister a statement which she subsequently read and signed. . . ." That statement was witnessed by four persons. The content of the statement was that she and Smith were not married. A custody fight ensued between Smith and the aunt of the deceased mother of the two children.

At trial Smith testified that for the purpose of intermarrying the couple drove to Idaho, a common-law marriage State, in 1938. They "registered at an auto camp as Judd Smith and wife and on each of two succeeding nights they registered as husband and wife."

The court quoted from 2 Schouler, *Marriage, Divorce, Separation* (6th ed.) p. 1438 § 1181:

> "A union once originating between man and woman, purely illicit in its character, and voluntarily so, there must appear some formal and explicit agreement between the parties thereto, or a marriage ceremony, or some open and visible change in their habits and relations, pointing to honest intentions, before their alliance can be regarded as converted into either a formal or an informal marriage, as although the relations between them were illicit in the beginning still a common-law marriage may later occur between them."

The Supreme Court of Washington underscored the finding of the trial judge that where parties cohabit illicitly in the State of their residence and happen to sojourn into another State that permits common-law marriage, the temporary stay in the latter, "by that conduct alone" does not confer the status of man and wife upon them.

> "Parties who live for years in an illicit relationship in a state in which they were domiciled will not find themselves married to each other if they happen to sojourn for a short time and hold themselves out as man and wife in a state where common law marriage is recognized." 23 Wash. 2d at 366, 161 P.2d at 192.

*See also Walker v. Yarbrough,* 257 Ak. 300, 516 S.W.2d 390 (1974); *Kennedy v. Damron,* 268 S.W.2d 22 (Ky. 1954); *Carroll v. Carroll,* 251 S.W.2d 989 (Ky. 1952); *Norcross v. Norcross,* 155 Mass. 425, 29 N.E. 506 (1892); *Cruickshank v. Cruickshank,* 193 Misc. 366, 82 N.Y.S.2d 522 (1948); *Walker v. Hildenbrand,* 243 Or. 117, 410 P.2d 244 (1966); *Kelly v. Consolidated Underwriters,* 300 S.W. 981 (Tex. Civ. App. 1927), *aff'd,* 15 S.W.2d 229 (App. Comm'n 1929).

Similarly, in the case of *In re Binger's Estate,* 158 Neb. 444, 63 N.W.2d 784 (1954), a man and woman who lived together in Nebraska made a number of temporary sojourns into Colorado where common-law marriage is recognized. The appellate court said that the pleasure trips into Colorado, lasting three or four days each, where "they either registered at a named hotel as husband and wife or stayed with relatives" and were known to their relatives "as husband and wife" and then returned to Nebraska was insufficient to turn the relationship into a common-law marriage. The court noted that the couple did not change their domicile from Nebraska to Colorado, nor did they contract or agree to contract a common-law marriage while they were in Colorado.

Whenever cohabitation between a man and a woman is commenced, at a point in time when either or both of them is under a disability with respect to the contracting of a valid marriage, strong affirmative evidence is required to show that a marriage was consummated after the impediment was removed. More simply stated, if the relationship is illicit in the beginning, strong evidence is required to demonstrate a change in the status. *Clark v. Clark,* 123 Colo. 285, 229 P.2d 142 (1951); *People v. Shaw,* 259 Ill. 544, 102 N.E. 1031 (1913); *In re Binger's Estate, supra; Schaffer v. Krestovnikow,* 89 N.J. Eq. 549, 105 A. 239 (1918); *Henry v. Taylor,* 16 S.D. 424, 93 N.W. 641 (1903); *State ex rel. Smith v. Superior Court for King County, supra; Williams v. Williams,* 46 Wis. 464, 1 N.W. 98, 32 Am. Rep. 722 (1879).

A common thread running through the cases is that of the intent of the parties. It is the same intent that must be found whenever the existence of a contract is alleged, because,

marriage, irrespective of whatever other adventurous undertaking it may be, is also a contract. If one of the parties to an alleged contract has no intent to enter into the agreement, there is no meeting of the minds and no valid contract exists.

The evidence in the instant case showed that Mr. Goldin on several occasions expressed a desire to enter into a civil marriage ceremony, but that Mrs. Goldin spurned his effort by asserting, "we are already married." Those proposals and rejections occurred prior to the Pennsylvania ski-trip weekends. They are, however, quite illustrative of the fact that neither party had the intent to become married under Pennsylvania common-law — Mr. Goldin, because he expressly testified he had no such intent, and Mrs. Goldin, because, if, as she said, "we were already married," then obviously she would not have had the intent to do in Pennsylvania what she already considered as a *fait accompli.*

We are unwilling to hold that a man and woman who travel from this State into a State that recognizes common-law marriages and cohabit for a few days are thereby deemed, in the eyes of the law, to be man and wife, unless there is shown a clear intent to enter into that status.

The Supreme Court of Oregon hit the nail on the head when it said, in *Walker v. Hildenbrand, supra:*

> "Common sense would indicate that something as serious and vital to the welfare of society as a determination of the marriage relation should not rest on something as insubstantial as a holiday visit to a common-law marriage state with a person of the opposite sex during which the participants held themselves out as husband and wife. This is particularly so where there is no evidence that the parties were aware that any change in their marital status would result or that the visit was made for the purpose of consummating a marriage." 243 Or. at 122-23, 410 P.2d at 246.

We agree with Judge Shearin that the appellant did not meet the burden of proof. Under the evidence adduced it was not shown that the parties intended their weekend or holiday ski trips to be construed as entry into a common-law marriage. We further hold that for purposes of this case, at least, Pennsylvania is not part of Heaven.

*Decree affirmed.*
*Costs to be paid by appellant.*