# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### November 21, 2000 Session

## RICHARD EUGENE STONER v. MARY ELIZABETH STONER

**Direct Appeal from the Chancery Court for Henry County**
**No. 17938     Ron E. Harmon, Chancellor**

---

**No. W2000-01230-COA-R3-CV - Filed January 18, 2001**

---

This appeal arises from a divorce between a couple with a long standing pre-marital relationship. Citing this relationship, the trial court classified two stock accounts as marital property and awarded Wife a portion of their funds. These accounts were pre-marital accounts of Husband. No marital funds were deposited in the accounts by either party and Wife had no interaction with the accounts. Under the circumstances of this case, the trial court's classification of this property as marital property amounts to recognition of a common-law marriage, and Tennessee does not recognize common-law marriages. As such, the trial court was incorrect in awarding funds from the accounts to Wife. The trial court correctly assigned pre-marital debt, divided the remainder of marital property, and awarded alimony ***in futuro*** and attorney's fees. We affirm in part and reverse in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in part;**
**Reversed in part; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which HOLLY K. LILLARD, J. and HEWITT P. TOMLIN, JR., SP. J., joined.

Teresa McCaig Marshall, Paris, Tennessee, for the appellant, Richard Eugene Stoner.

Vicki H. Hoover, Paris, Tennessee, for the appellee, Mary Elizabeth Stoner.

## OPINION

On February 14, 1997, Richard and Mary Stoner were married in Maryland after a relationship stretching back almost twenty years. They moved to Tennessee in September of that year, shortly after Mr. Stoner retired from his job with the federal government. Mrs. Stoner was not employed during this twenty year period but did receive Social Security payments.[1] The couple purchased a house and made the down payment using funds from Mr. Stoner's stock account. They

---

[1]Mrs. Stoner received Social Security before her 65th birthday due to a disability.

also purchased a new car for Mr. Stoner using his premarital vehicle as a trade-in. Eventually, the couple was joined by Mrs. Stoner's son from a previous marriage, who moved in with them after a request by Mrs. Stoner.

The marriage was not a happy one. Mrs. Stoner ran the household's finances and Mr. Stoner claimed he was given an allowance of $15 per week. Mr. and Mrs. Stoner maintained separate bedrooms and constantly argued over seating arrangements in the other rooms. Mr. Stoner testified that he was verbally abused by both his wife and her son. Eventually, after Mrs. Stoner's son claimed he was attacked by Mr. Stoner, Mrs. Stoner committed Mr. Stoner to a mental hospital for depression. After he was released, Mr. Stoner filed for divorce citing inappropriate marital conduct.

During the parties' twenty year relationship but prior to their marriage, Mrs. Stoner claimed to have placed money in a joint checking account which was used to pay for various expenses of both parties. In her deposition, Mrs. Stoner stated she deposited her $337 Social Security check in the joint account "once or twice a year." However, at trial, Mrs. Stoner testified that she had deposited her check every month. Mr. Stoner disputed the assertion that Mrs. Stoner deposited any funds, claiming that her name was on the account because she had authority to sign checks. While Mrs. Stoner confirmed at her deposition that she only had the authority to sign checks, she testified at trial that this statement was incorrect and that the account was a joint account. Funds from this account were invested by Mr. Stoner at Legg Masons. These stocks were placed in both a stock account and a trust account. Both accounts were solely in Mr. Stoner's name and remained so throughout the couple's relationship and eventual marriage.

The trial court granted the plaintiff a divorce on the grounds of inappropriate marital conduct. In its property division, the trial court cited the long term relationship of twenty years between the parties as the basis for its division. Mr. Stoner received his personal checking account, one-half of his vehicle, one-half of the marital home, one-half of the Legg Mason stock account valued at approximately $78,250 and one-half of the accumulated marital property. Mrs. Stoner received the remainder of the marital property.

Mr. Stoner was awarded $41,340 of a Legg Mason Value Trust account as pre-marital separate property. The remaining balance, representing the growth of the account's value during the marriage, was split equally between the parties. In addition, Mrs. Stoner kept her pre-marital vehicle and was awarded attorney's fees. Mr. Stoner was assigned all the debt from the marriage and ordered to pay alimony *in futuro.*

The issues presented on appeal by the appellant, as we perceive them, are as follows:

I.      Did the trial court err in determining that the pre-marital relationship revealed that the parties had used joint efforts and funds to accumulate assets?

II.     Did the trial court err in finding that the pre-marital relationship entitled Mrs. Stoner to approximately one-half of the value of the two Legg Mason accounts in Mr. Stoner's name?

III.    Did the trial court appropriately divide the equity in the marital home?

IV.     Did the court appropriately divide the marital debts?

V.      Did the court appropriately divide the equity in Mr. Stoner's vehicle?

VI.     Did the court properly award alimony *in futuro* after only two years of marriage?

VII.    Did the trial court properly award attorney's fees to Ms. Stoner?

To the extent that these issues involve questions of fact, our review of the trial court's ruling is ***de novo*** with a presumption of correctness. ***See*** Tenn. R. App. P. 13(d). Accordingly, we may not reverse the court's factual findings unless they are contrary to the preponderance of the evidence. ***See, e.g., Randolph v. Randolph***, 937 S.W.2d 815, 819 (Tenn. 1996); Tenn. R. App. P. 13(d). With respect to the court's legal conclusions, however, our review is ***de novo*** with no presumption of correctness. ***See, e.g., Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen and Ginsburg, P.A.***, 986 S.W.2d 550, 554 (Tenn. 1999); Tenn. R. App. P. 13(d).

**Pre-Marital Relationship**

The trial court in this case found that the "parties ha[d] . . . long term relations extending back some twenty (20) or more years; that during that time these parties used joint efforts and joint funds in accumulating assets of both parties. That Mrs. Stoner, while not accumulating in her own name, contributed significantly to the accumulation of the parties' assets by her domestic assistance and companionship and that these parties held themselves out to be, and in fact, accumulated as if they were husband and wife. . . . [T]his long standing partnership gave rise to the Court's allowing Mrs. Stoner a portion of the assets." This finding by the trial court resulted in Mrs. Stoner receiving one-half of the Legg Mason stock account valued at $78,250. In addition, the trial court found that the Legg Mason Value Trust account had experienced significant growth since the date of the marriage. The court awarded Mr. Stoner $41,340 as separate pre-marital property and split the account's growth during the marriage equally, resulting in Mrs. Stoner receiving $28,515.

"It is settled law in Tennessee that though a common law marriage cannot be contracted within this State, our courts do recognize a common law marriage contracted in a state where such a marriage is valid." ***Lightsey v. Lightsey***, 407 S.W.2d 684, 690 (Tenn. Ct. App. 1966). As the entire pre-marital relationship of the parties involved in this action took place in Maryland, it is thus necessary to examine Maryland law. Our examination of Maryland law discovers that its views on common law marriage parallels Tennessee law in many respects.

Maryland has continuously held that a common-law marriage, valid where contracted, is recognized in this State. Absent a showing that the "marriage" was valid where performed, no amount of holding out as husband and wife, reputation as being husband and wife, number of children, or any other factor will transpose the living together of a man and woman into a legal marriage in this State.

*Goldin v. Goldin*, 426 A.2d 410, 412 (Md. Ct. Spec. App. 1981).

The trial court's findings in this matter are clearly erroneous under Tennessee law. The court's findings show that it used the parties' pre-marital actions as a basis for the property division of the assets held by the parties. The court found that Mrs. Stoner had contributed "significantly to the accumulation of the parties' assets by her domestic assistance and companionship." In addition, the court cited the fact that these assets had been accumulated while the parties held themselves out to be husband and wife. As we have already stated, neither Tennessee nor Maryland recognize common law marriage. As such, the trial court in essence recognized a common-law marriage between the Stoners, and the trial court erred in dividing the pre-marital assets of Mr. Stoner on this basis.[2]

## Division of Pre-Marital Assets

As stated above, the trial court incorrectly determined that the pre-marital actions of the parties in this case should be determinative in the allocation of assets upon the divorce of the parties. As such, it is necessary to correct this error. This court finds that Mr. Stoner should have been awarded the entire balance of the Legg Mason stock account as separate property and the trial court's order is modified accordingly.

The trial court also determined that a portion of the Legg Mason Value Trust was marital property. This account, like the Legg Mason stock account, was a pre-marital asset solely in Mr. Stoner's name. It remained so throughout the marriage. The court determined that the increase in value that this Trust experienced during the marriage should be divided as marital property. However, Tennessee Code Annotated section 36-4-121(b)(1)(B) states that "'[m]arital property' includes income from, and any increase in value during the marriage of, property determined to be separate property. . . if each party *substantially contributed* to its preservation and appreciation. . . during the period of the marriage." Tenn. Code Ann. 36-4-121(b)(1)(B) (Supp. 2000) (emphasis added).

---

[2]We do not suggest that there cannot be reasons for dividing pre-marital assets in a related situation. For example, if the parties had, in addition to maintaining a pre-marital relationship, run a business together, a court could find that a business partnership existed between the parties. *See Bass v. Bass*, 814 S.W.2d 38 (Tenn. 1991). We note, however, that such a finding would most likely *not* be based in the law of domestic relations but in some other area of law such as business partnership law.

The testimony of Mrs. Stoner during the trial made it clear that she had not "substantially contributed" to the increase in the value of this account.

Q. How many times have you contacted the broker regarding this stock, Ms. Stoner?

A. I have never contacted - - I let [Mr. Stoner] do everything and I trusted him and he always told me what was going on.

. . . .

Q. But you've never had any active participation in the stocks, have you?

A. No. I never requested to do so. Dick handled it and I trusted him to do what was right with it.

Mrs. Stoner's lack of "substantial contribution" was reinforced by Mr. Stoner's testimony.

Q. Mr. Stoner, the stock that we've been talking about today, is that your premarital stock?

A. It is. I owned all that stock prior to the marriage.

Q. When did you first have that stock?

A. I was just talking to my broker today and he said I'd been up there about 20 years.

Q. Do you recall the last time you actually contributed any finances to the stock yourself?

A. I haven't since I got married.

. . . .

Q. Before that, did you do anything yourself with the stock except just let your broker handle it?

A. Mostly my broker, on his advise I bought and sold.

. . . .

Q. Did [Mrs. Stoner] assist you in any way handling the stock?

A. No way.

It is thus clear that Mrs. Stoner did not "substantially contribute" to the increase in Mr. Stoner's pre-marital Legg Mason Value Trust account. Therefore, the increase in value of this account during the marriage is not marital property. Instead, it is the separate property of Mr. Stoner. Thus, we find that the entire amount of the Legg Mason Value Trust, approximately $98,000, should have been awarded as separate property to Mr. Stoner, and the trial court's order is modified accordingly.

## Marital Home

Subsequent to the filing of this appeal, an order was entered in the trial court stating that the parties had agreed that Mr. Stoner would purchase Mrs. Stoner's interest in the marital residence for the sum of $16,676.03. As this action was taken upon the agreement of the parties, we hereby find that this issue has been waived on appeal.

## Marital Debts

"Courts should apportion marital debts equitably in much the same way that they divide marital assets." *Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989). As such, it is necessary to examine the relevant statute concerning the apportionment of marital assets to determine if the trial court properly assigned the marital debts of the parties. That statute states:

> In making equitable division of marital property, the court shall consider all relevant factors including:
> (1) The duration of the marriage;
> (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
> (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
> (4) The relative ability of each party for future acquisitions of capital assets and income;
> (5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
> (6) The value of the separate property of each party;
> (7) The estate of each party at the time of the marriage;
> (8) The economic circumstances of each party at the time the division of property is to become effective;
> (9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;
> (10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c) (Supp. 2000).

While examining the trial court's division of marital debts in light of the statute above, we must be cognizant that

> [t]rial courts have wide latitude in allocating debt, and appellate courts are hesitant to second-guess their decisions as long as the debt has been properly classified and then divided in a fair and equitable manner. Determining whether debt has been divided fairly and equitably requires appellate courts to consider the trial court's allocation of the debt in light of the division of property and the provision, if any, for spousal support.

*Mansfield v. Mansfield*, No. 01A019412CH0058, 1995 WL 643329, at *9 (Tenn. Ct. App. Nov. 3, 1995).

In our review of the record in this case, we feel that the trial court classified and divided the debt of the parties in a "fair and equitable manner." *Id.* The court properly allocated the debt using the factors listed in Tennessee Code Annotated section 36-4-121(c). Indeed, our previous determination that Mrs. Stoner was not entitled to any funds from Mr. Stoner's Legg Mason accounts reinforces this allocation. We hereby affirm the trial court's order assigning the entire amount of the marital debt to Mr. Stoner.

### Equity in Mr. Stoner's Vehicle

> "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing or up to the date of the legal separation hearing unless equity would require another valuation date and owned by either or both spouses as of the date of filing of a complaint for divorce or complaint for legal separation, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, or the date of legal separation hearing unless equity would require another valuation date, and valued as of a date as near as reasonably possible to the final divorce hearing date or the date of the legal separation hearing . . . .

Tenn. Code Ann. § 36-4-121(b)(1)(A) (Supp. 2000).

Upon a review of the record, we take notice that Mr. Stoner has acknowledged that his vehicle is marital property. As such, he does not claim that his vehicle is improperly classified as marital property. Instead, he claims that it was unfair that he did not receive a larger portion of the vehicle's worth. Mr. Stoner argues that he should receive credit for the value of his pre-marital vehicle that was traded-in to purchase the new vehicle.

As "the trial court is granted broad discretion in adjusting and adjudicating the parties' interest in all jointly owned property. . . . Its decision regarding division of the marital property is entitled to great weight on appeal." **Watters v. Watters**, 959 S.W.2d 585, 590 (Tenn. Ct. App. 1997). Upon reviewing the record, we find that the trial court did not abuse its discretion in this area of the property division. As such, we affirm the trial court's ruling in respect to the division of Mr. Stoner's vehicle.

**Alimony Award**

"The trial court has broad discretion concerning the amount and duration of spousal support. Its decision is factually driven and requires a balancing of factors." **Watters**, 959 S.W.2d at 593. The factors, as set forth under Tennessee statute, are as follows:

(A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;
(C) The duration of the marriage;
(D) The age and mental condition of each party;
(E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
(F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;
(G) The separate assets of each party, both real and personal, tangible and intangible;
(H) The provisions made with regard to the marital property as defined in § 36-4-121;
(I) The standard of living of the parties established during the marriage;
(J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
(K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and
(L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-101(d) (Supp. 2000).

In the past, this court has determined that "[t]he most significant factors are need and the ability to pay." **Watters**, 959 S.W.2d at 593. Examining all of the factors set forth under the statute and giving due weight to the most significant, we find that the trial court did not incorrectly determine the amount and type of support for Mrs. Stoner. It is clear that Mrs. Stoner, due to her age and medical problems, has a great need for alimony **in futuro**. It is equally clear that Mr. Stoner has

the ability to pay the amount awarded by the court. As such, we affirm the trial court's award of alimony *in futuro* to Mrs. Stoner.

## Attorney's Fees

"The award of legal expenses is appropriate when the spouse seeking them lacks sufficient funds to pay her expenses or would be required to deplete her resources." **Watters**, 959 S.W.2d at 594. In this case, Mrs. Stoner was awarded attorney's fees by the trial court. We take notice that the trial court thought such an award appropriate even after the division of marital property and the award of alimony *in futuro*. We feel that such an award is even more proper given on modification of the trial court's award of the Legg Mason accounts.[3] Therefore, we hereby affirm the trial court's award of attorney's fees to Mrs. Stoner.

## Conclusion

Based on the foregoing conclusions, the trial court's order awarding Mrs. Stoner part of the value of the Legg Mason accounts is hereby reversed. The trial court's decisions on all other matters are affirmed. Costs on appeal are assessed against the appellant, Richard Eugene Stoner, and his surety, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE

---

[3]The Appellant has also recognized that Mrs. Stoner would be unable to pay her attorney's fees if the court ruled in his favor on this issue. The recognition by the Appellant that it would be equitable to pay such fees is to be commended.