*963 OPINION OF THE COURT
Joseph S. Mattina, J.
A motion has been brought before this court for temporary alimony, support and counsel fees.
This case raises two issues: 1. Did a common-law marriage exist between the parties in Pennsylvania. 2. Was the defendant unjustly enriched based on an implied contract and/or constructive trust entered into between the parties in New York State.
The facts in this case indicate that the plaintiff and defendant began living together in a rented apartment on Crescent Avenue in the City of Buffalo, New York, in February of 1948, later purchased a home at 4537 Dorchester Blvd., Blasdell, New York, in 1954 and have continued to live together since that time for a period of approximately 28 years until April of 1977.
Although the parties were never married in New York State, the plaintiff used the name Susan McCullon from the inception of their relationship with the full knowledge and approval of the defendant. The plaintiff was introduced to their friends and relatives as his wife. They owned joint accounts with her name appearing on said accounts as Susan McCullon. They filed Federal and New York State income tax returns listing Susan McCullon as his wife, and they purchased their home at 4537 Dorchester Blvd., Blasdell, New York, and took title jointly as Leonard and Susan McCullon, his wife. The plaintiff always wore a wedding ring during the period they lived together.
Prior to February, 1948, she worked as a nurse’s aide, but during the 28 odd years they lived together she did not seek outside employment. She described herself as a housewife, her responsibilities consisting of housework, preparing the meals, doing the laundry and caring for the defendant and three children born of the union, Chris McCullon born in 1949, Laura McCullon born in 1955, and Mary Lou McCullon, born in 1960. In return the defendant supported the plaintiff and their children, paying all the necessary family bills including food, utilities, clothing and taxes on their house.
According to Susan McCullon, on page 8 of the proceeding held before this court on March 9, 1978, referring to Leonard McCullon, "Well, he told me that we should stick together and work at it and make a home for us and our children.”
*964 In 1953, Susan McCullon was divorced from her previous husband, and even though defendant was aware of said divorce he continued to live with plaintiff.
It should be noted that every year during this period from 1948 to 1977, the parties would visit his parents, his father and stepmother, in Cresco, Pennsylvania, for two to four weeks, where she was introduded as Mrs. McCullon to both his relatives and friends. Further the parties slept in one bedroom in the beginning and later when the children were born one child slept in a cot in the same room. The one child who testified, Laura McCullon, indicated that she never knew that her parents were not married until April of 1977 when the separation took place.
In a similar case Skinner v Skinner (4 Misc 2d 1013), the New York court held that a common-law marriage was established where defendant’s only contact with the State of Pennsylvania was for three weeks in August of 1953. The court noted in that case (pp 1013-1014) that: "During all of these times and up to the separation between them in 1954, the evidence establishes that plaintiff and defendant Skinner held themselves out and conducted themselves as husband and wife in New York, Pennsylvania and the District of Columbia. They owned cars and acquired a home and furnishings in this State, title to the real estate being taken in the name of defendant Skinner and plaintiff, his wife.”
The court went on to say (p 1014) that: "While in the State of Pennsylvania there is a presumption of continuance as to a relation illicit in its inception, nevertheless, it does not apply to cases where in good faith the parties continued to live together as husband and wife after the complete removal of the obstacle in the way of a valid marriage; and marriage may be established by long continued cohabitation and reputation.” (See Matter of Haskel, 31 Misc 2d 680.)
Likewise in this case the evidence establishes that the plaintiff and defendant Leonard McCullon held themselves out and conducted themselves as husband and wife in New York and Pennsylvania after the impediment of her previous marriage was removed in 1953. In this case the visits to Pennslyvania were over a prolonged period of years; for two to four weeks at a time, as contrasted to the one contract in 1953 in Skinner.
The plaintiff and defendant had bank accounts in both *965 names, title to the real estate was taken in the name of defendant Leonard McCullon and plaintiff his wife. Their income tax returns were filed as husband and wife. He worked to support the plaintiff and their family of three children. She labored in the home and cared for the three children.
Although common-law marriages are not valid in the State of New York; nevertheless, if entered into in the State of Pennsylvania where such marriages are considered valid, such marriages are deemed valid in New York. (Shea v Shea, 294 NY 909.)
Accordingly this court finds that plaintiff and defendant entered into a valid common-law marriage resulting from their holding out each other as husband and wife in Pennsylvania after her divorce in 1953.
As to the second issue, assuming, arguendo, that a common-law marriage was not established, was unjust enrichment based on implied contract and/or constructive trust proven in New York State?
Clearly there has been a rapid shift in the role of women in patriarchal societies within the last two decades from a position of subordination to a position of equality. As such husbands and wives in many cases adjusted to a contemporary image of the family as a partnership of equals with regard to the reasonable expectations of the modern family.
Beyond the formalities of the ceremonial marriage and as part of the development of the family, unstructured domestic unions have become widespread.
A recent Readers Digest article (June, 1978) entitled, "A second look at the Sexual Revolution”, which was condensed from Time magazine, indicated that more than 1.5 million Americans have taken to living together, up more than 100% since 1970, who "are inclined to talk about their loyalty, to each other in much the same tones that newlyweds once used.” Further, Time commissioned the firm of Yankelovich, Skiller and White, to conduct a national survey, one of the questions being: Is it morally wrong for a couple who are not married to live together? The results, "No, said 52%.” This was the only category of liberated sexual behavior included in the poll that was accepted by the majority. Further census statistics indicate between 1960 and 1970, the number of unmarried couples living together has increased eightfold.
These changing social mores in our society have given rise *966 to inequities and hardship which arise with the dissolution of nonmarital relationships.
Many law review articles have made suggestions in an effort to deal with this social need. One such article is entitled "Property Rights of De Facto Spouses Including Thoughts on the Value of Homemakers’ Services”, in which the author Carol S. Bruch indicates that the use of labels such as "meretricious” and "illicit” do not deter large numbers of people from entering nonmarital unions in place of marriage. "As a result the law can no longer plausibly ignore these relationships and the harm they may cause to one partner. Rather sound policy requires that these family forms be acknowledged to the extent necessary to prevent hardship and injustice.” (10 Fam LQ 101, 103.)
She then proceeds by offering a judicial settlement of the problem quoting Professor Brigitte Bodenheimer.
"1. If an unmarried couple enters an express contract to share property or make payments in return for property or service contributions, the agreement should be enforced according to its terms regardless of their nonmarital cohabitation.
"2. If the unmarried couple agrees that their relationship should entail no property or monetary consequences, again the agreement should govern.
"3. If it can be gathered from the facts and circumstances that the unmarried parties have engaged in an implied partnership or joint enterprise, or there is an implied-in-fact contract or trust, recovery should be allowed in accordance with their implied expectations.
"4. But when there is no agreement one way or the other, the law should relieve inequity and hardship to one of them and prevent unjust enrichment of the other.” (10 Fam LQ 101, 136.)
Professor Walter O. Weyrauch in his article "Informal and Formal Marriage — An Appraisal of Trends in Family Organization” (28 U Chi L Rev 88), after noting that: 1. mere cohabitation of a man and woman contravenes our conventional morality, 2. cohabitation in this relationship results in illegitimate children, 3. unrecorded common-law marriages result in possible clouding of titles to land, suggests that these arguments should be balanced against the harsh effect which *967 results when parties are denied any remedy because their union has not been conventionally solemnized.
Stephen C. Waterbury, who authored an unpublished paper entitled, "Property Rights Upon Termination of Unmarried Cohabitation” (April, 1978), would approach this problem by means of statutory amendment to be entitled "Suggested Termination of Unmarried Cohabitation Act.” As part of this act, section 4, a presumption is created that "unmarried couples who cohabit for a period of more than three years intend that property consequences shall result from their unmarried cohabitation.” This presumption can be overcome by written agreement.
As far as disposition is concerned section 5, if not rebutted by written agreement which distributes the property or which explicitly rebuts section 4, provides that "the court shall assign each cohabitant’s separate property to that cohabitant and the court shall divide nonmarital accumulated property, without regard to misconduct”. This division would be based on various factors set forth in the act.
Enlightened Legislatures and courts, in which jurisdictions, have attempted to deal with these inequalities and hardships by the application of various legal and equitable remedies.
Some statutory adjustment has already begun. For example, New Hampshire gives relief on the death of a de facto spouse by treating the remaining partner as decedent’s surviving spouse, provided cohabitation is established for the preceding three years. (NH Rev Stat Ann, § 457:39.)
Other States in this country and other countries have made judicial adjustments. In Latin America, for example, they have a policy affording protection to stable nonmarital unions.
In this country, common-law States such as Indiana, Kansas and Oklahoma have formulated quasi-partnership theories to achieve equitable results for a good faith party to an invalid marriage. Community property States such as Louisiana and Texas have permitted recovery based on implied contract where there was consideration other than illicit relations, usually based on a fact pattern evincing a joint venture or contribution of funds, or efforts towards acquisition of property where enrichment would otherwise result.
The state of the law in Washington has been, that the parties are presumed to have disposed of jointly accumulated property exactly as they have disposed of it. This presumption *968 is known as the Creasman presumption. In a meretricious relationship for example, property accumulated belongs to the party who holds title. (Creasman v Boyle, 31 Wn 2d 345.) The presumption, of course, can be rebutted by evidence to the contrary. Nonmarital partners have used various devices to rebut this presumption, implied-in-fact partnership or joint venture, constructive trust, resulting trust and express or implied in fact contracts to make a will.
Justice Finley in West v Knowles (50 Wn 2d 311, 316), deplored the injustices resulting from the Creasman presumption stating: "[t]his court * * * in effect, sometimes said, 'We will wash our hands of such disputes. The parties should and must be left to their own devices, just where they find themselves.’ To me, such pronouncements seem overly fastidious and a bit fatuous. They * * * ignore the fact that an unannounced (but nevertheless effective and binding) rule of law is inherent in any such terminal statements by a court of law * * * So, although the courts proclaim that they will have nothing to do with such matters, the proclamation in itself establishes, as to the parties involved, an effective and binding rule of law which tends to operate purely by accident or perhaps by reason of the cunning anticipatory designs of just one of the parties.”
Although the Creasman rule has not been overruled thus far, the Washington court in Matter of Thornton (81 Wn 2d 72, 79) in dictum indicated that a common-law doctrine of property rights may be established on the termination of a nonmarital relationship which has been stable for a long period of time.
A Michigan court in 1973 suggested recovery where there was an express agreement between nonmarital spouses regardless of whether the consideration was for "services” or "caring for” the other parties. (Tyranski v Piggins, 44 Mich App 570.)
In Latham v Latham (272 Ore 421, 427) the court held that an agreement for equal division of property acquired during the relationship was not void as against public policy regardless of the fact that the primary consideration was the assumption of the "amenities of married life” including sexual intercourse.
Lastly, California which has been a front runner in this country, setting forth innovative approaches to social problems in most areas of the law, has recently enunciated a *969 doctrinal change concerning de facto marriages in two landmark decisions which should serve as a guiding beacon for the rest of the country.
In both, Matter of Cary (34 Cal App 3d 354) and more recently Marvin v Marvin (18 Cal 3d 660), the Supreme Court of California has afforded judicial relief to nonmarital couples in terms of property accumulated during the marriage. In Matter of Cary the facts involved nonmarital partners who lived together for eight years. During that time he worked to support their family of four children. She labored in the home and cared for the children. They had borrowed money and obtained credit, filed income tax returns as husband and wife, title to the home they purchased was in both names and they held themselves out as husband and wife to family and friends. Since they were not married their accumulated property was not subject to equal distribution pursuant to community property principals. In order to overcome the inequities where, as in this instance, familial unmarried cohabitation was involved, the court observed that the Family Law Act of 1969, removed the concepts of fault and punishment from the determination of family property rights indicating that this relationship came within the "broad purview” of the act.
Having redefined the scope of the Family Law Act the court cautioned that application of the act required "not only an ostensible marital relationship but also an actual family relationship, with cohabitation and mutual recognition and assumption of the usual rights, duties and obligations attending marriage.” (Matter of Cary, 34 Cal App 3d 345, 353, supra.) That is, if the parties conduct themselves according to the established set of standards of traditional marriage law, cohabitation and a holding out as husband and wife being necessary prerequisites, then the relationship would be recognized by the court regardless of any characterization as marital, putative or meretricious.
In the second California case Marvin v Marvin, the court rejected the Cary reasoning but declined to disapprove the Cary result. The court agreed that if that case had been decided under prior precedent an unfair property distribution would have resulted. The court in Marvin implied that the Cary case could have been decided the same way depending on the proven expectation of the parties.
As Justice Tobriner stated in his decision, the Marvin discussion was not intended to equate unmarried cohabitation *970 with married couples or create common-law marriage. What Marvin did was give the nonmarital partner, "the same rights to enforce contracts and to assert her equitable interest in property acquired through her effort as does any other unmarried person.” (Marvin v Marvin, 18 Cal 3d 660, p 684, n 24, supra; emphasis added.)
The court pointed out that although parties living together without the benefit of ceremonial marriage did not have the same expectations as a putative spouse, they had the possibility of other expectations and equitable considerations.
"The parties may well expect that property will be divided in accord with the parties’ own tacit understanding and that in the absence of such understanding the courts will fairly apportion property accumulated through mutual effort.” (Marvin v Marvin, supra, p 682.)
The facts of that case were that Michelle Trióla and Lee Marvin lived together continuously for six years without the benefit of ceremonial marriage. The property accumulated during the existence of the nonmarital relationship was in Lee Marvin’s name only. In the lawsuit Michelle claimed an oral agreement that during cohabitation they would " 'combine their efforts and earnings and would share equally in any and all property accumulated as a result of their efforts whether individual or combined.’ ” She further alleged that the agreement was subsequently modified:
"(a) that in order that plaintiff would be able to ' "devote her full time to defendant * * * as a companion, homemaker, housekeeper and cook.” ’ It was further agreed that the plaintiff would ' "give up her lucrative career as an entertainer [and] singer” ’
"(b) that in return defendant Marvin, would ' "provide for all plaintiff’s financial support and needs for the rest of her life.” ’ ” (Marvin v Marvin, 18 Cal 3d 660, 666, supra.)
Marvin was married during a portion of this relationship but in 1964 was divorced. She contended that the pooling efforts were ratified subsequent to his divorce. On May 8, 1970, she changed her name legally from "Triola” to "Marvin”. On May 11, 1970, they separated and since that date until November, 1971, he paid her $800 per month.
The court stated that express contracts between nonmarital partners are enforceable unless the sexual services rendered form the exclusive consideration of the contract. In referring *971 to the kind of relationship the court would not countenance, the court stated (p 683): "the nonenforceability of agreements expressly providing for meretricious conduct rested upon the fact that such conduct, as the word suggests, pertained to and encompassed prostitution. To equate the nonmarital relationship of today to such a subject matter is to do violence to an accepted and wholly different practice.”
The court then went to declare that property acquired during a nonmarital relationship may be apportioned between the parties even in the absence of an express agreement. The court in this respect indicated that if the parties conduct evinces an appropriate intent, an implied contract or agreement of partnership or joint venture could be found. Beyond these remedies, dependent on the intent of the parties, the court suggested that theories of constructive trust, resulting trust and quantum meruit could be employed.
The overriding principle to be derived from Marvin which permeates the entire opinion is, given the broad spectrum of people who live without the benefit of ceremonial marriage for various reasons and in view of data indicating a substantial increase in the number of such couples, the best presumption is that nonmartial partners intend to deal fairly with each other and as such (p 684): "the judicial barriers [to] * * * the fulfillment of the reasonable expectations of the parties to a nonmarital relationship should be removed”.
The court then set forth the various remedies, as stated above, available to protect the parties lawful expectations.
It seems clear that in both cases the court was attempting to separate a moral judgment relating to sexual behavior from the judicial determination of property ownership by the removal of legal impediments imposed solely as a result of the nonmarital relationship.
New York cases dealing with nonmarital couples have condemned contracts for future illicit cohabitation. (Matter of Greene, 45 F2d 428.) However, the Second Department has enforced an oral agreement where the plaintiff made cash contribution toward purchase price and maintenance of property, refusing to invalidate the agreement merely because the parties had been involved in a meretricious relationship. (Muller v Sobol, 277 App Div 884.)
In this regard Williston, Contracts (vol 15, 3d ed, § 1745) says: "The fact that past cohabitation is the motive for a *972 promise will not invalidate it, although such cohabitation is not in itself sufficient consideration.”
More recently in Merrick v Merrick a memorandum decision of the Supreme Court, Justice Gomez stated that in the absence of satisfactory proof to establish that the parties are married, the application for alimony pendente lite and support was denied as "incapable of being rendered beyond all hope ” (Emphasis added.) That decision was affirmed by the Appellate Division. (Merrick v Merrick, 56 AD2d 827.)
In Fischer v Wirth (38 AD2d 611, 612) plaintiff raised the issue of imposing a constructive trust over defendant’s property. An examination of that case indicated that the court refused to impose a constructive trust. In that situation the wife contributed financial services in addition to household services, title to the property was in the husband’s name. Her earnings were used for their mutual support while the husband’s salary was invested for both of them to be set aside for their later days.
In its conclusory remarks the court stated (p 612): "There may be a moral judgment that can be made on the basis of the respondent’s conduct and the imperfectly expressed intention of some possible future benefit to appellant but that is not enough to set the court in motion.”
This court recognizes the sanctity of the marriage as one of the bulwarks of Amercian society. As such it does not condone relationships which exist outside the marriage. Nor does it minimize the importance of marriage, but at the same time it cannot ignore the untold physical and mental anguish which may be visited on one of the parties, in this situation, if no relief is afforded.
For that reason the court in good conscience refuses to accept the fatalistic attitude of the courts in Merrick or denial of relief by way of imposition of a constructive trust in Wirth under the circumstances of this case.
In West v Barton — Malow Co. (394 Mich 334, mot for rearg den 395 Mich 902) the court dealing with workmen’s compensation benefits recognizing the hardship to the plaintiff fashioned a remedy where plaintiff was totally dependent on defendant, Clarence West, for support. "[S]he did bear to Clarence West the relationship of a wife for the 13 years preceding his untimely death. During those years plaintiff was responsible for maintaining their household while deceased undertook the responsibility for furnishing them both with *973 monetary support. In name and in outward appearance plaintiff and deceased were Mr. and Mrs. West.” (West v Barton— Malow Co., supra, pp 340-341.)
In that case the court in order to prevent unjust enrichment chose to treat a nonmarital partner as a "dependent” under the workmen’s compensation law.
Although this court is not prepared to place its stamp of approval on every nonmarital relationship, it is obvious from the review of the court decisions and legislative mandates, that in certain cases exceptions should be made where circumstances warrant such action.
In this case it is obvious that we are not dealing with a new generation free style type of living arrangement.
Here a woman in the later years of her life is left abandoned with her infant child; she has forsaken employment and any independent desires of her own in order to care for the defendant and their children. She must now start over, only she is now 28 years older, at a time for her when gainful employment is hard to find, especially with the additional burden of caring for their infant child, Mary Lou.
Meanwhile, evidently with callous indifference to the feelings of his daughters, the defendant raises the issue of a valid marriage to their mother at the time he leaves her to pursue a new life with another woman, a strain of cruelty which could result in their bastardization.
The evidence at the proceeding held before this court on March 19, 1978 and August 4, 1978, establishes by his conduct and statement that he worked to support the plaintiff and their children during the 28 years they lived together; further he provided a home in their joint name, paid the utility bills and taxes on the house, purchased the food and clothing for her and the children and opened a bank account in their joint names. In addition the trial testimony taken on August 4, 1978 indicates that the support for the plaintiff was to continue for the rest of her life, "He said he would always take care of me.” The fact that these considerations were independant of any sexual motivation can be discerned from the fact that at least for the last 15 years there were no sexual relations between the parties.
Clearly there is more involved here than two people living together and producing three children.
The conduct of the defendant in supporting the plaintiff *974 for 28 years together with his statement that he would always care for her, resulted in her forbearance of employment and providing household services for him over a protracted period of years, the last 15 of which involved no sexual conduct between them.
Based on these facts this court finds that the conduct of the plaintiff constituted an implied promise to forbear employment and provide household services for the defendant over 28 years in consideration for his implied contract and promise to provide a home and future support. (Marvin v Marvin, 18 Cal 3d 660, supra.)
Therefore, both on grounds of common-law marriage in Pennsylvania and an implied contract in New York State, alimony pendente lite in the amount of $50 per week is granted to plaintiff, $50 per week support to the child Mary Lou, with exclusive possession of home owned by the parties to the plaintiff.
Temporary counsel fees are awarded in the amount of $750.