Carol **MASON**, Appellant,

v.

Bernardo **ROSTAD**, Appellee.

No. 82–53.

District of Columbia Court of Appeals.

Argued Nov. 23, 1982.

Decided April 24, 1984.

Morris Kletzkin, Washington, D.C., for appellant.

John C. Maginnis III, Washington, D.C., for appellee.

Before NEBEKER and MACK, Associate Judges, and GARDNER,* Associate Judge, Superior Court of the District of Columbia.

GARDNER, Associate Judge:

Defendant-appellant has appealed a final judgment, upon a jury verdict, for breach of contract. Plaintiff-appellee was awarded the sum of $76,500, found to be due him for the reasonable value of services rendered and material furnished by him, in the improvement and renovation of the appellant's real property. Appellant was awarded the sum of $2,000, found to be due her on her counterclaim against the appellee for conversion of certain personal property of hers. Appellant claims that the appellee had relinquished any quasi-contractual claim that he may have had against her, growing out of his improvement of her real property, when he reconveyed to her the interest that he had acquired in the property after she transferred title to the property from herself, as sole owner, to them, as joint tenants. She also claimed that, in any event, any quasi-contractual claim by the appellee is unenforceable because the parties had been living together in an extra marital relationship during the time the services were performed and the materials were supplied. Appellant also contends that the trial court erred in refusing to permit her claim for punitive damages, for conversion, to go to the jury. We disagree with appellant and affirm.

In his complaint, appellee alleged that he and appellant had entered into an oral agreement which contemplated that he would remodel the interior of appellant's home and, if they ever ceased residing together, appellant would reimburse him for the value of the remodeling; and that, after he had contributed those services and materials, pursuant to that agreement, and they ceased residing together, the appellant breached the agreement by refusing to pay. Appellant's answer denied the formation or existence of any agreement between the parties and denied that she was indebted to the appellee or that he was entitled to recover any sums from her.

Appellee was granted leave to amend his complaint. In his amended complaint, he alleged the relationship which had existed between the appellant and him and that, during that relationship, he had rendered certain services and provided certain materials in the improvement and renovation of her home, with the expectation that he would receive full compensation for them. He further alleged that the appellant had always accepted those services and materials, knowing that the appellee expected compensation for them; and, though she had benefited from those services and materials, she refused to pay any compensation for them. Based upon this alleged conduct and the transaction and occurrences between the parties, the appellee in his amended complaint, added a count for recovery for breach of a contract implied in

* Sitting by designation pursuant to D.C.Code 11- 707(a) (1981).

fact and another count for recovery in quasi-contract to prevent appellant's unjust enrichment.

Much of the evidence concerning the relationship between these two people is undisputed. They met in 1972. The appellee was a self-styled home designer and improvement contractor. The appellant was a cooking teacher and caterer, who conducted her catering business out of her residence, in the District of Columbia. The relationship bloomed into a courtship and they became lovers. Finally, in October 1975, he moved into her home and lived with her there until July 1979.

Appellee testified that appellant's house was in a dilapidated condition at the time he moved in. In October 1975, he began renovating the kitchen. However, there were so many things that needed to be done that they decided to renovate the entire house, including a finished rental unit in the basement. Appellant had no funds with which to undertake such a task and she was concerned as to how appellee would be compensated for his services and expenses in connection with this renovation. At appellant's suggestion they consulted an attorney, whom she knew, who drafted a proposed agreement between them. Under its terms, appellee would advance to her the sums needed for the improvement of the premises and she would repay those sums at such time as the premises were sold or transferred by her to any other person. Appellee did not execute that written agreement because it provided only for the reimbursement of his expenses and did not take into account payment for his services. After further discussion between them, they settled upon the idea of appellant placing appellee's name on the title to the house as a joint tenant, and, thereafter, using the proceeds obtained from refinancing that property to purchase other properties, as co-owners, for investment purposes. In furtherance of that plan, the appellant transferred the real property in question to appellee and her as joint tenants. They had some preliminary transactions, respecting the purchase of other properties thereafter, but there were no actual purchases. Shortly thereafter, appellant's attitude toward appellee changed and she began to complain that she would like to have only her name on the deed to her home. Thus, on April 17, 1979, appellee executed a deed whereby title to the property was reconveyed to appellant solely. Appellee hoped by such reconveyance to improve and restore the relationship between appellant and him. The relationship did not improve and, in July 1979, appellant locked him out of her house and changed the locks on the door.

Testimony and exhibits tended to show that the appellee made an extensive renovation of appellant's home and, in doing so, rendered services and provided materials, the reasonable value of which exceeded $135,000. Appellee received no compensation or reimbursement.

Appellant testified that the appellee did renovate her home, although he did not completely finish the job; but that there were no discussions about her paying him for doing the job and he made no demands upon her for payment. Appellant testified that the appellee was going to restore and renovate her entire house in exchange for her cooking and cleaning and other services and that, during the time he lived in her home, she paid the mortgage on the house and the utilities and supported the appellee. Yet, she admitted that she went with appellee to see the lawyer whom they consulted regarding an arrangement for her to pay appellee for his services rendered in renovating her home. She also admitted that, after she had placed the title to the property in their names jointly, she had signed two contracts for the purchase of other properties with the intent to take title to those properties in their joint names and to utilize the equity in her house to effect the purchase of the other properties. After she locked appellee out, in 1979, she permitted him to return on several occasions to remove his personal belongings. She testified that, while doing so, he also removed

some items of personal property which he had given to her and in which appellee had no title or interest.

Appellee testified that, during the time they lived together, he paid no rent to her and that, for the last year and a half of his stay there, he maintained an office in her home. He further testified that she bought the food, did the cooking and washing and paid the utility bills. However, he gave her, from time to time, cash, amounting to $9,885, and made payments for her on a new automobile, totalling $2,505. He also bestowed various gifts upon her, some conditioned upon the continuance of their relationship.

In his instructions, the trial judge included instructions on appellee's theories of recovery for breach of contract implied in fact and for recovery in quasi-contract to prevent unjust enrichment. The court refused to submit to the jury defendant-appellant's claim for punitive damages on her counterclaim, on the grounds that there was no evidence to support such a claim. The appellee withdrew his count on an express contract.

The jury returned a verdict for the defendant-appellant on the implied-in-fact contract count. It found for the plaintiff-appellee on the quasi-contract count, in the sum of $76,500. On appellant's counterclaim for conversion, the jury returned a verdict for appellant, in the sum of $2,000. Appellant's motion for judgment n.o.v. or for a new trial or remittitur was denied and judgment was entered in accordance with the verdict.

■ On appeal to this court, appellant, relying on the special relationship of the parties, argues that the trial court erred in submitting the quasi-contractual theory to the jury. We disagree. The court's instructions regarding quasi-contractual recovery faithfully observed the established law in this jurisdiction. *Hillyard v. Smither & Mayton,* 76 A.2d 166 (D.C.1950); *Bloomgarden v. Coyer,* 156 U.S.App.D.C. 109, 479 F.2d 201 (1973). There is ample evidence in the record to warrant such in-

struction and to sustain the jury's verdict for appellee on this count.

Appellant contends, however, that quasi-contractual claims for unjust enrichment will not lie between "cohabiting unmarried parties." She cites no decision in this jurisdiction in support of such a contention; nor did she make such a contention during the proceedings below. In any event, we cannot agree that the fact of unmarried cohabitation between the parties bars either party from asserting against the other a claim which would otherwise be enforceable under principles of law of general applicability.

Some courts have refused to enforce contracts implied in fact, alleged to have arisen out of the performance of domestic or personal duties and services during cohabitation of unmarried persons. They have done so on the ground that it is unreasonable to imply an agreement to pay for such services, rendered when the relationship of the parties raises the natural inference that, as a matter of human experience, such services were rendered gratuitously. *See Marvin v. Marvin,* 18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106 (1976); Annot., 94 A.L.R.3d 552, 559 (1979). Yet, courts have enforced express agreement providing for benefits in exchange for such services. *Morone v. Morone,* 50 N.Y.2d 481, 429 N.Y.S.2d 592, 413 N.E.2d 1154 (1980); *Latham v. Latham,* 274 Or. 421, 547 P.2d 144 (1976); *Mullen v. Suchko,* 279 Pa.Super. 499, 421 A.2d 310 (1980). Where there is an express agreement, the court is not confronted with the uncertain task of discerning the intentions of the parties and assigning legal significance to the conduct of the parties during what is a personal and noncontractual relationship.

Other courts have taken the position that unmarried persons who cohabit together live in a world beyond the law and are undeserving of the law's remedies if they turn to the courts for an authoritative resolution of their controversies. These courts refuse relief and leave the parties as they

were when they invoked the court's jurisdiction. This refusal to grant relief is rationalized as an observance of public policy or the "clean hands" doctrine. *See Merit v. Losey*, 194 Or. 89, 240 P.2d 933 (1952). By refraining to decide such controversies, these courts establish, without proclamation, an implicit rule of law that, whatever advantage may be wrongfully gained by one party to unmarried cohabitation at the expense of the other party, the law will not afford a legal remedy when the relationship ends.

In recent years, social customs have changed and many people of all ages are living together without marriage ceremony and the benefit of legal principles that apply to the financial affairs and property interests of married couples. These nonmarital relationships also create problems of inheritance and issues respecting the ownership and division of property and the disposition of claims when the relationship ends. Along with this change in customs, legal principles to meet these problems have emerged. Express agreements between unmarried persons living together are held to be enforceable as though they were not living together, as long as sexual relations were not part of the consideration. *Morone v. Morone, supra; Latham v. Latham, supra; Mullen v. Suchko, supra.* Cohabitation is held not to disable the parties from entering into a contract within the recognized rules of contract law. The bargain made is not invalidated or rendered unenforceable by the mere fact that the parties thereto are unmarried persons living together. *Cougler v. Fackler*, 510 S.W.2d 16 (Ky.1974).

Courts will also grant relief to these persons under the theories of implied agreements, where such agreement is found to exist, *Marvin v. Marvin, supra; McCullon v. McCullon*, 96 Misc.2d 962, 410 N.Y.S.2d 226 (1978) (quasi-contract, *Gilbert v. Cliche*, 398 A.2d 387 (Me.1979)), resulting trust, *Sugg v. Morris*, 392 P.2d 313 (Alaska 1964), or constructive trust, *Omer v. Omer*, 11 Wash.App. 386, 523 P.2d 957

(1974), and implied partnership, *In re Estate of Thornton*, 81 Wash.2d 72, 499 P.2d 864 (1972).

Having carefully considered the various views expressed by these courts in dealing with disputes arising out of these relationships, we regard the position that the courts will not participate in resolving the disputes in accordance with general principles of law and, thus, will leave the parties to their own devices, to be unrealistic and unresponsive to social need.

■ We hold that, on general principles of law and equity, the appellee is entitled to recover the funds he expended, the reasonable value of the work he performed and the services he rendered in renovating and improving the appellant's real property, reduced by the reasonable value of any counter-benefits received by him. The fact that they were unmarried and living together does not bar his claim. *Cross v. Cross*, 94 Ariz. 28, 381 P.2d 573 (1963).

Appellant, arguing that the trial court erred in denying her motions for directed verdict and judgment notwithstanding the verdict, insists that even if appellee acquired a quasi-contractual claim against her for the value of his services and materials, that claim was extinguished by the deed conveying his title and interest in the real property to her. She ignores the distinction existing between a conveyance of an interest in real property and a gratuitous release of the grantor's quasi-contractual claim for the value of work and materials contributed to improving the real property, prior to the conveyance.

■ Although one may, as a gift, forgive an obligation owed the donor by the donee, not represented by physical evidence, such as a note or other instrument—as distinguished from a gift of a tangible object—the law requires that there be not only a donative intent to make the gift but also the delivery of a receipt or some equivalent instrument indicating a release of the obligation. *In re Russell's Estate*, 385 Pa. 557, 123 A.2d 708 (1956); *Crutcher v.*

*Johnson County,* 79 S.W.2d 932 (Tex.Civ. App.1935). In this case, the deed conveying the real property made no reference to the appellee's claim for renovation against appellant. The only evidence offered by appellant in support of her theory of extinguishment by gift was the testimony of a friend, who accompanied appellant to the office of an attorney for the execution of the deed reconveying the house to appellant solely. The friend testified that, while there, she asked appellee if he would release appellant from all financial responsibilities and that appellee had replied "Yes". However, the attorney testified that he, the friend and the parties were all together in the same room at the time the deed was signed and acknowledged by appellee, and that appellee never mentioned to anyone present that he was going to release his claim against appellant. Appellant gave no testimony bearing on this issue. The jury rejected her defense of release by gift. Its verdict is in accordance with the law and is supported by the evidence. Its finding will not be disturbed. *Chamberlain v. Chamberlain,* 287 A.2d 530 (D.C.1972); *Harrington v. Emmerman,* 88 U.S.App.D.C. 23, 186 F.2d 757 (1950).

Finally, appellant complains that the Trial Judge erred in refusing to submit her claim for punitive damages to the jury. Punitive damages may properly be awarded in an action for conversion "where the act of the defendant is accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury." *Smith v. Whitehead,* 436 A.2d 339, 352 (D.C.1982) (citing cases). We agree with the trial judge that there was insufficient evidence in the record to justify submitting the issue of punitive damages to the jury.

The judgment of the trial court is hereby

*Affirmed.*