Howard J. ROSS, et al., Appellants,

v.

Manuel FIERRO, Appellee.

No. 93–CV–435.

District of Columbia Court of Appeals.

Argued March 29, 1995.

Decided June 1, 1995.

Howard J. Ross, Washington, DC, for appellants.

Thomas P. Hartnett, Washington, DC, for appellee.

Before FERREN, SCHWELB and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

After a business venture among two then-friendly couples went sour, the former friends quarrelled about who should bear the loss. This lawsuit resulted, and following a bench trial, the judge held that appellants Howard and Terry Ross, who are husband and wife, were not entitled to recover damages from appellee Manuel Fierro, either for breach of contract or as equitable contribution. On appeal, the Rosses contend primarily that the trial judge failed to apply correct legal principles to the evidence of record. We agree with the Rosses with respect to their claim for contribution. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

## I.

## THE FACTS[1]

In December 1984, the Rosses, together with Manuel Fierro and his then-wife, Elaine, began a retail business in upscale children's clothing under the trade name "Twinkles." They opened a store in Chevy Chase, Maryland. The business was incorporated, and each of the four principals contributed $10,000 in return for a 25% interest in the company. The parties filed a "subchapter S" election with the Internal Revenue Service pursuant to 26 U.S.C. §§ 135 et seq. Under this arrangement, corporate losses may be deducted on the stockholder's personal income tax return.

In the years that followed, the stockholders took out several loans from various lending institutions and, in turn, lent the money to the corporation. In late March 1988, the stockholders borrowed $150,000 from First American Bank of Virginia (the "Old Loan") in order to pay off an earlier note to another bank. The "Old Loan" was to come due in April 1989. Both Rosses and both Fierros were personally liable on the "Old Loan." During 1988, Twinkles also leased space at Tysons Corner, Virginia, with a view to opening a second store.

In early February 1989, Elaine Fierro advised the Rosses that she was leaving her husband; she claimed that Manuel Fierro was abusing her and the couple's young son. Mrs. Fierro asked the Rosses not to tell her husband of her plans, so that she could accomplish the departure smoothly. Howard Ross, who is an attorney,[2] honored this request and also provided advice to Mrs. Fierro with regard to the selection of an attorney. Marked hostility developed between Howard Ross and Manuel Fierro when Elaine Fierro left for Florida with her son and her husband learned of Howard Ross' actions.

Meanwhile, the "Old Loan" was soon to become due. The business had suffered some reverses, and no funds were available to redeem the note. Howard Ross discussed the matter with both Fierros. An amicable agreement was reached with Elaine Fierro, who agreed to transfer her share of the business to the Rosses in exchange for their assumption of her share of the liability on the "Old Loan." First American apparently agreed to this arrangement, so that the Rosses now owned 75% of the business but had also assumed 75% of the company's liabilities. The Rosses were unable, however, to reach a mutually satisfactory accommodation with Manuel Fierro, and their inability to do so led to the present litigation.

Shortly after Elaine Fierro left her marriage, Howard Ross and Manuel Fierro had several apparently acrimonious conversations regarding how to deal with the company's liability. They were unable to settle their differences. Howard Ross discussed taking out a new loan in order to repay the "Old Loan." Fierro testified that he told Howard Ross that "I don't want to be a signer on any document that I could be personally liable for"—obviously a reference to a new loan—and that

> there was a discussion that they would take care of it. Nothing that it's due, you got to pay, that sort of thing....

The Rosses eventually took out a new loan from First American on which only they were liable. Howard Ross testified that

> I told [Fierro] that he was off the bank loan, but I also made it clear to him that I did not consider him released from his liability to me, both because we had always agreed that it would be proportionate [and] because I paid off the loan that he was liable on.

Ross thus evidently believed that the loan that Manuel Fierro was "off" was not the "Old Loan," but rather the new one.

---

1. The trial judge made extensive written findings of fact relating to this controversy, and the parties have likewise discussed the evidence in considerable detail. In our view of the case, only a few of the facts are relevant to the principal issue presented on appeal, and we confine our factual recitation accordingly.

2. Fierro is a lobbyist and consultant, primarily in the field of equal opportunity. Terry Ross and Elaine Fierro had prior experience in the clothing business.

In his findings of fact, the trial judge wrote:

Fierro testified credibly that he had, at least, several discussions with Ross concerning the loan/line of credit and that Ross advised him that he did not "have to worry" about the line of credit since the Rosses were going to take it over. Fierro believed and accepted Ross' statements to be true. The Rosses took Fierro off the line of credit with the consent of the bank.

The judge did not specify whether the Rosses were "going to take over" the "Old Loan" or the new one.

After they were unable to reach an agreement with Manuel Fierro, the Rosses paid off the "Old Loan" by taking out a new one from First American. They did so because, according to their brief, they were left with the following choices:

(i) let the bank sue all four stockholders, and face the additional cost of litigation under the existing note (which granted the bank the right to cost of collection, including attorney's fees); (ii) pay off the $150,000 bank loan and sue the Defendant for $37,500 by right of contribution; (iii) liquidate all of the company's assets and use the available proceeds to pay down the bank loan; or (iv) sign on a New Note, by themselves, in order to pay off the Old Note.

The first two "options" were the least viable. The first would have had an adverse effect on the Plaintiffs' credit standing, and the Plaintiffs did not have the cash necessary to entertain the second. The third option was not viable because the company had a negative net worth at the time, and the vast majority of its assets consisted of inventory (carried at a cost of approximately $100,000), which would have brought approximately 10 cents on the dollar in liquidation.

The Rosses elected the fourth option. Howard Ross claimed that they had done so in order to reduce any potential losses to all concerned. They placed a second mortgage on their home, and they demanded that Manuel Fierro pay his proportionate share of the company's liabilities. Fierro declined to do so. Twinkles suffered reverses and went out of business on or about July 1, 1990.

## II.

### TRIAL COURT PROCEEDINGS

The complaint in this case was filed in July 1991. A non-jury trial was held on February 18 and 19, 1993. After the parties had presented their evidence, the judge orally found for Fierro on the Rosses' claim for breach of contract. He held that "no reasonable fact-finder would conclude by a fair preponderance of the evidence that the parties reached an oral agreement to share corporate losses equally." During oral argument on the claim for contribution, however, the judge remarked, *inter alia*, that

[i]t does seem a bit inequitable to have [Ross] take the entire fall for this.... [I]t certainly does appear to me that there may indeed [be] some inequity, and I would want to [take] a look at the case law before I brush aside those very compelling equitable considerations the Rosses have brought to my attention.

The judge took the equitable claim for contribution under advisement. On March 25, 1993, the judge issued a comprehensive memorandum opinion and order on the remaining issues, ruling in Fierro's favor on all of them. After making fifty-seven findings of fact, the judge analyzed the issue of contribution in pertinent part as follows:

[P]laintiffs, having learned that defendant's former wife planned to leave him, unilaterally took it upon themselves to renegotiate the loan, hoping to parlay their 75% interest in the company to their economic advantage if the Twinkles II venture proved profitable or, if it did not, to minimize their greater personal exposure for losses based upon their significant personal expenditures connected with the Twinkles II operation. But the record does not support plaintiffs' claim that defendant expressly or impliedly agreed to this strategy. On this record, plaintiffs have not established by a preponderance of the credible evidence any well founded basis in law or equity for its claimed 25% contribution

from defendant for their personal losses in the amount of $85,352.00.

The judge entered judgment in favor of Manuel Fierro. This appeal followed.

## III.

## THE CLAIM FOR CONTRIBUTION

The Rosses' first claim at trial was that the stockholders had agreed to share losses equally. The trial judge found that there was no such agreement. This determination was based, in part, on the judge's assessment of the credibility of the witnesses, and we cannot say that it was clearly erroneous. *See* Super.Ct.Civ.R. 52(a); *In re S.G.*, 581 A.2d 771, 774–75 (D.C.1990).

The Rosses' alternative claim was for contribution. Fierro's attorney explicitly conceded at oral argument that his client was an obligor under the "Old Loan." Counsel further acknowledged that if the Rosses had paid the "Old Loan" off in cash, Fierro would have been liable to them for his 25% share of the obligation.[3]

■ This concession was well-grounded. As the court explained in *George's Radio v. Capital Transit Co.*, 75 U.S.App.D.C. 187, 126 F.2d 219 (1942),

> general principles of justice require that in the case of a common obligation, the discharge of it by one of the obligors, without proportionate payment from the other, gives the latter an advantage to which he is not equitably entitled.

*Id.* at 189, 126 F.2d at 221; *see also Bair v. Bryant*, 96 A.2d 508, 510 (D.C.1953) (quoting *George's Radio* ). Accordingly, "it is axiomatic that one joint obligor may ordinarily claim contribution from a co-obligor after having discharged their mutual obligation." *Fithian v. Jamar*, 286 Md. 161, 410 A.2d 569, 574 (1979) (citations omitted).

In light of counsel's concession and the authorities that effectively compelled him to make it, it is difficult to understand why the result should be different where the Rosses borrowed the money with which to redeem the "Old Note," rather than paying that note off in cash. Although Fierro's argument is not entirely clear, he appears to rely primarily on the trial judge's finding regarding the conversations between Howard Ross and Manuel Fierro after Elaine Fierro left the marriage. Ross told Fierro, the trial judge found, that Fierro need not "worry" about the line of credit because the Rosses "were going to take it over."

Fierro admits that he was an *obligor* under the "Old Loan." His theory that his obligation under that loan was discharged presupposes the happening of some event which extinguished his liability. That event, according to Fierro, was the Rosses' negotiation of a new loan on which Fierro was not personally liable. Fierro does not claim, however, that he gave the Rosses anything of value in exchange for the release of his debt. He is thus effectively contending that the Rosses made him a gift of his share of the joint obligation. *See Mason v. Rostad,* 476 A.2d 662, 666–67 (D.C.1984) ("one may, as a gift, forgive an obligation owed the donor by the donee").[4]

But "there can be no gift if the alleged donor did not intend to make one." *Harrington v. Emmerman*, 88 U.S.App.D.C. 23, 27, 186 F.2d 757, 761 (1950). Fierro, as the person asserting that a gift was made, has the burden to establish it. *Id.; see also Duggan v. Keto*, 554 A.2d 1126, 1134 (D.C. 1989). The issue thus boils down to whether the evidence would support a finding that the Rosses intentionally made a substantial gift to Fierro at a time when their financial position was unfavorable and the personal relationship between the purported donors and donee had disintegrated.

Howard Ross was motivated to release Fierro from the latter's share of the liability because he wanted so badly to get rid of Fierro from the business. This contention has no logical foundation, for Fierro continued to hold a 25% share in the business regardless of whether or not he contributed to the redemption of the "Old Loan."

---

3. Fierro's attorney also appeared to concede that if the Rosses had taken out a new loan without advising Fierro that they had done so, they would have been entitled to claim contribution from Fierro.

4. At oral argument, Fierro's attorney did not contest the proposition that his position rested on the existence of a gift. He claimed that

The essential elements of an *inter vivos* gift are donative intent, delivery, and acceptance. *Mason, supra,* 476 A.2d at 666; *Schafer v. United States,* 656 A.2d 1185, 1189 (D.C.1995); *Murray v. Gadsden,* 91 U.S.App. D.C. 38, 49, 197 F.2d 194, 205 (1952); *Dorsey v. Dorsey,* 302 Md. 312, 487 A.2d 1181, 1184 (1985); 38 C.J.S. *Gifts,* § 10, at 786 (1943 & Supp.1994). "In order to prove donative intent, it must be shown from the evidence that the donor *clearly and unmistakably* intended to permanently relinquish all interest in and control over the gift." *Dorsey, supra,* 487 A.2d at 1184 (emphasis added; citation omitted); *see also United States v. Schroeder,* 348 F.2d 223, 226 (8th Cir.1965); 38 C.J.S. *Gifts,* § 15, at 791–92 (1943 & Supp. 1994).

In this case, the purported gift consists of an intangible, namely, the alleged forgiveness of a debt. We have stated in this context that

> [a]lthough one may, as a gift, forgive an obligation owed the donor by the donee, not represented by physical evidence, such as a note or other instrument—as distinguished from a gift of a tangible object— the law requires that there be not only a donative intent to make the gift *but also the delivery of a receipt or some equivalent instrument indicating a release of the obligation.*

*Mason, supra,* 476 A.2d at 666 (emphasis added; citation omitted). Proof of delivery is indispensable, and "[i]f the thing be not capable of actual delivery, there must be some act equivalent to it." *In re Russell's Estate,* 385 Pa. 557, 123 A.2d 708, 712 (1956) (quoting 2 Kent's Commentaries, § 439, at 558). "The rule has long been that no merely oral declaration will transform a debt into a gift." *Id.* at 712 (quoting *Quirk v. Quirk,* 155 F. 199, 206 (E.D.Pa.1907)). "A mere promise by an obligee ... to forgive a debt, the promisor being under no legal obligation to do so, is but an executory gift, and as long as the transaction remains executory, and the promisor retains the evidence of indebtedness, the gift is not a perfected one and no equity passes to the promisee thereby." 38 C.J.S. *Gifts,* § 47, at 829 (1943 & Supp.1994).

Applying these principles to the record before us, we conclude as a matter of law that Fierro failed to prove that a gift was made to him. In the first place, donative intent was not "clearly and unmistakably" established. *See Dorsey, supra,* 487 A.2d at 1184. The testimony of the principals, described in detail at pages 236–237, *supra,* indicates that much of their discussion centered on whether Fierro would be personally liable on a new note, rather than whether he continued to be an obligor on the "Old Loan;" and there was apparent confusion as to which note was the subject of the discussion.

In his finding on the issue, the judge did not specify whether Fierro was told not to worry about the "Old Loan" or the new one; the judge referred to the two, collectively, as a "line of credit." Fierro, who was already an obligor on the "Old Loan," testified that he did not want "to be a signer on any document that I would be personally liable for"—obviously a reference to a new note. According to Fierro, Howard Ross assured him that he need not worry about that; the response, like the expression of concern that triggered it, was also an apparent reference to personal liability on a new obligation. Ross essentially confirmed that he had given this assurance, but he claimed—contrary to Fierro's testimony—that he specifically told Fierro that Fierro remained an obligor on the "Old Loan" and would have to pay his share. Fierro inferred that he was relieved of any obligation on the "Old Loan," however, largely on the basis of Ross' alleged failure to tell him that he still owed his share of the original obligation.

Even if, in light of the judge's favorable finding as to Fierro's credibility, we consider only Fierro's account and altogether discount Ross' version,[5] the record would not, in our

---

5. Ross testified, as we have noted, that he told Fierro that he expected Fierro to pay his share of the "Old Loan." It is possible, of course, that the judge did not credit this testimony, although the judge did not specifically so state. *Cf. Brown*

*v. United States,* 590 A.2d 1008 (D.C.1991), in which we recognized

> a [rebuttable] presumption that each witness, including the parties, has sworn to the truth and it was the duty of the jury to reconcile conflicting statements if they could, but if they

view, sustain a finding that the Rosses possessed a "clear and unmistakable" donative intent with respect to Fierro's liability on the "Old Loan." Our conclusion is reinforced by the undisputed fact that, at the time of the discussions between Ross and Fierro, intense hostility existed between the two men. It is improbable, to say the least, that the Rosses, who were in such financial distress that they were compelled to take out a second mortgage on their home, would be willing to bestow upon a man whom Howard Ross apparently disliked[6] a gift worth many thousands of dollars.

But even if the evidence of donative intent were sufficient to support a finding that the Rosses made a gift, there was no evidence whatever of the kind of delivery required by *Mason*, 476 A.2d at 666, *In re Estate of Russell*, 123 A.2d at 712–13, and other authorities. Drawing every reasonable inference from the evidence, as we must, in Fierro's favor, *In re S.G.*, *supra*, 581 A.2d at 774, the record discloses no more than an oral declaration by Howard Ross that Fierro was no longer liable on the "Old Loan." "A gift *inter vivos* made by parol of a chose in action of this character, not evidenced by a written instrument, is invalid." *In re Estate of Russell*, *supra*, 123 A.2d at 713 (citation omitted). "[A] gift of a simple debt cannot be made effective without a deed, the execution of an adequate release or transfer in writing, or the performance of some other act placing

the debt beyond the legal control of the creditor." *Tucker v. Brown*, 199 Wash. 320, 92 P.2d 221, 225 (1939). In the absence of such a written release or its equivalent, the claim that Fierro received a gift must fail as a matter of law.[7]

## IV.

## UNCLEAN HANDS

Fierro contends that the Rosses' equitable claim for contribution is barred by "unclean hands."[8] He relies in part on the trial judge's finding that

> [i]n the fall of 1989, the Rosses decided to merge Twinkles into a new corporation, called Twinkles of Virginia, and by so doing were going to further dilute Fierro's stock interest in the D.C. corporation.[9]

Fierro further contends that Howard Ross abused his position as an attorney and that Ross falsely witnessed the two Fierros' signatures on a document unrelated to the "Old Loan."

▮▮▮ Fierro can prevail with a defense of "unclean hands" only if the conduct on the part of Howard Ross[10] of which Fierro complains was the cause of the obligation from which Fierro seeks to be relieved. "Unless the amount owed the [Rosses] is the direct result of the [alleged] unethical behavior . . . the clean hands·doctrine does not bar [their]

---

could not, they were the exclusive judges of the credibility of the witnesses and the weight to be given their testimony.
*Id.* at 1021 n. 19 (quoting *United States v. Hoffa*, 349 F.2d 20, 52–53 (6th Cir.1965), *aff'd*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966)). An attempt to reconcile the testimony of Howard Ross and Manuel Fierro leads inevitably to the conclusion that the explicit reassurances that Fierro need not worry had to do with signing a new obligation, and that Fierro's perception that his obligation on the "Old Loan" had been forgiven was based substantially on inferences drawn by him on the basis of what Howard Ross allegedly failed to say. There may well have been a misunderstanding between the two men—people sometimes hear what they want to hear. The judge's finding does not address this possibility and is not necessarily to the contrary.

**6.** Ross testified that Fierro threatened to smear Ross' reputation around town if Ross did not agree to resolve the two men's differences on Fierro's terms. Whether this allegation is true or

not, the fact that Ross made it is revealing with respect to his attitude *vis-a-vis* Fierro at the time he supposedly made him a gift.

**7.** Although it is undisputed that Fierro was not liable on the "New Loan" from First American negotiated by the Rosses, there is no documentary evidence to support the claim that he was released from his obligation to the Rosses after they had redeemed the "Old Loan."

**8.** Fierro had also interposed the defense of "unclean hands" in his Answer.

**9.** See also the judge's Conclusions of Law, quoted at page 237, *supra*.

**10.** Fierro's allegations in support of this defense are directed solely at the conduct of Howard Ross. In light of our disposition of the case, we need not decide the effect on the defense of the lack of any allegation against Terry Ross.

recovery." *International Tours & Travel, Inc. v. Khalil,* 491 A.2d 1149, 1155 (D.C. 1985).

The obligation from which Fierro seeks to be relieved on the basis of Ross' actions was created by Fierro's signing on as an obligor of the "Old Note" in March 1988. Fierro does not claim that Ross fraudulently or improperly induced him to undertake this obligation, and there is no evidence that Ross did so. In fact, most if not all of the conduct of which Fierro complains occurred long after that obligation was created, and thus could not have been the direct (or even indirect) cause of Fierro's liability.

Moreover, the trial judge did not find that Howard Ross' hands were unclean. The portions of his order from which we have quoted do not, on their face, suggest any unlawful or unethical conduct on Ross' part. Rather, the judge found that the controlling stockholders of a corporation attempted to maximize their control and profits and to minimize their losses. The judge also found that Ross had previously been Fierro's attorney and that Fierro trusted him, but he made no finding that Ross abused his position as an attorney, either with respect to securing Fierro's signature on the "Old Loan" or in any other way.[11]

Finally, we note once more Fierro's acknowledgment, through counsel, that he would have been liable for contribution if the Rosses had paid off the "Old Note" in cash. The viability of the "unclean hands" defense cannot depend on the means used by the Rosses to repay the money which the stock-holders had borrowed from First American. Accordingly, even if the "unclean hands" defense were otherwise meritorious, which it is not, its viability in light of counsel's concession would be dubious at best.

## V.

## CONCLUSION

For the foregoing reasons, the trial court's decision in Fierro's favor on the Rosses' claim of breach of contract is affirmed. The subsequent decision denying the Rosses' claim for contribution is reversed. The case is remanded for further proceedings consistent with this opinion.[12]

*So ordered.*[13]

---

11. The judge did find that Howard Ross witnessed the signature of Manuel Fierro and Elaine Fierro on a document which neither Fierro had in fact signed. Ross claimed that he had Elaine Fierro's authority to sign the names. Whether he had such authority or not, these events related to Ross' demand, subsequently abandoned, that Fierro pay him approximately $1,000 towards a corporate obligation to the landlord of a warehouse in McLean, Virginia. The incident obviously had no connection with Fierro's obligations under the "Old Loan." *See Loughran v. Loughran,* 292 U.S. 216, 229, 54 S.Ct. 684, 689, 78 L.Ed. 1219 (1934) ("[e]quity does not demand that its suitors shall have led blameless lives").

12. We hold only that Fierro remained liable on the "Old Loan." On remand, the trial judge is directed to determine the amount of contribution to which the Rosses are entitled in light of our holding and of any relevant subsequent events.

13. The Rosses contend in the alternative that, if their claim for contribution is denied, they are entitled to repayment from Manuel Fierro of a $10,000 distribution which, according to them, represented a corporate loan. Fierro claims that the payment was a dividend which he is entitled to retain and that, even if it was not a dividend, only $5,000 went to him, while the balance was distributed to Elaine Fierro. Because we have upheld the Rosses' claim for contribution, we need not and do not reach the merits of the Rosses' alternative theory.